Michael D. MARCUS, Plaintiff-Appellant,

v.

NATIONAL LIFE INSURANCE COMPANY, Defendant-Appellee.

No. 17367.

United States Court of Appeals, Seventh Circuit.

Feb. 6, 1970.

Gale L. Marcus, Chicago, Ill., for appellant.

Owen Rall, Joseph J. Hasman, Chicago, Ill., Peterson, Lowry, Rall, Barber & Ross, Chicagó, Ill., of counsel, for appellee.

Before KNOCH, Senior Circuit Judge, and CUMMINGS and KERNER, Circuit Judges.

KNOCH, Senior Circuit Judge.

The District Court entered judgment for defendant-appellee, National Life Insurance Company, after hearing by the Court on Count I, trial by jury on Count I having been waived, and after the close of all evidence in a jury trial of Count II, on a directed verdict for defendant, from which plaintiff-appellant, Michael D. Marcus, has taken this appeal.

Count I, as amended, which was submitted to the Court on evidence adduced at the trial of Count II, excerpts from deposition testimony and memoranda, pursuant to agreement of the parties, sought accounting and payment of commissions allegedly due plaintiff from defendant.

Count II sought damages for alleged malicious interference with a contract between plaintiff and H. F. Johnson. When Count II was amended after the jury had been impaneled, defendant's answer to the amended complaint included the defense that the period of the applicable statute of limitations had run. The Trial Judge denied plaintiff's motion to strike this defense. He allowed plaintiff to withdraw the amended Count II which had elicited this defense but also allowed the defendant's answer to stand, and later, as indicated, allowed defendant's motion for a directed verdict on Count II.

Defendant, a Vermont corporation authorized to carry on life insurance business in Illinois, maintains an agency in Chicago which is operated by H. F. Johnson as General Agent. From the testimony of Morton Laird, defendant's senior vice president and chief actuary, and that of Mr. Johnson himself, it appears that Mr. Johnson's contract with defendant obligated him to employ and train agents (subject to defendant's rarely exercised right of approval) and to collect premiums. It further appears that on request of defendant, Mr. Johnson was obligated to exercise any right he might have to terminate his own contracts with agents.

In August 1956, Mr. Johnson and plaintiff entered into an insurance broker's contract which in April 1957 was replaced by a "Career Agent's Contract." Defendant was not a party to this contract but by endorsement thereon guaranteed compensation to plaintiff in the event of termination of Mr. Johnson's own contract with defendant by death or otherwise.

Plaintiff's contract with Mr. Johnson provides that any claims for compensation are personal claims against Mr. Johnson only and in no case against defendant for any services or acts performed under that contract, which also gave Mr. Johnson the right to terminate on 20 days' written notice, in which event, 8, 9 and 10 year renewal commissions and persistency fees would not be payable.

Mr. Johnson did terminate the contract effective June 1, 1961, by letter dated May 8, 1961. Mr. Johnson sent that letter in response to a request in a letter dated April 4, 1961 from defendant's assistant superintendent of agencies indicating that the request was made after extended consideration by defendant's committee on insurance because of long standing differences in philosophy between plaintiff and defendant.

These differences were explained in the testimony of David F. Hoxie, a member of the insurance committee from 1959 to 1961. In 1959, he stated he had discussed with plaintiff the latter's sales approach and plaintiff's statements that one should not accumulate cash values in a life insurance policy for purposes of investment. Mr. Hoxie said he told plaintiff this was completely contrary to the defendant's attitude with respect to "financed insurance". Mr. Hoxie testified further that when insurance is financed by outside borrowing, increases in outside interest rates above the insurer's policy loan rate cause a shift in the police holder's borrowing from outside sources to the insurance company. Thus, he said, the insurance company finds itself being forced under its policy contracts to make, for example, 5% loans to its policy holders instead of 6 to 8% loans in the investment market. Further, as the cash value of the policy increases with time, the indebtedness against it also has been increasing and an agent for another company or even the agent who initially sold the policy may suggest that a healthy policy holder terminate and start over to escape the interest burden. Meanwhile the policy holders with impaired health who have become greater risks tenaciously maintain their policies so that the insurance company is the victim of adverse selection both ways. He said that the defendant's philosophy contemplated that financed insurance would have a very minor place in the over-all merchandising of life insurance. He also explained the defendant's concern about possible conflicts of interest for dually licensed agents who would sell life insurance, motivated by commissions on the premiums, but who might also persuade the policy holder to borrow the cash value to invest in securities on the sale of which the agent would also receive a commission or a fee for advice. Plaintiff was licensed to sell insurance, to act as an investment advisor and to practice law, and had years of experience in banking concentrating on investments and loans. He was the only dually licensed agent in Mr. Johnson's office.

There was evidence of plaintiff's continued espousal, in print in articles composed by him, or by his public relations representative, of totally financed insurance and his sale of that type of insurance almost exclusively despite efforts beginning in 1959 to change his attitude. Plaintiff places no credence in this reasoning, pointing to defendant's vacillation from time to time down the years in holding strictly to this view and to plaintiff's excellent record of sales while under contract with Mr. Johnson.

Count II seeking damages for malicious interference with plaintiff's contract with Mr. Johnson was filed November 16, 1967, more than five years after the termination effective June 1, 1961. When in response to the amended Count II, defendant adopted its original defenses denying any malicious action and alleging lawful business reasons for its conduct, it also pleaded, as stated above, the Illinois Five-Year Statute of Limitations, Ill.Rev.Stat.1967, c. 83 "Limitations" ¶ 16.

Count I, as amended July 5, 1968, after the trial of Count II, alleged that defendant was plaintiff's employer and was unjustly enriched by plaintiff's loss of fees under his contract made with Mr. Johnson as agent for defendant. However, the contract itself provided that Mr. Johnson alone was obligated to pay commissions, all claims being personal claims against him and not against defendant, and that the commissions and persistency fees sought were not payable after termination.

Count I as amended also states that Mr. Johnson orally promised that he would not, and that defendant could not, terminate the contract absent mis- or mal-feasance by plaintiff and submission of at least one insurance policy in each 24-month period. It is a part of plaintiff's theory that the defendant was somehow bound by this oral statement of Mr. Johnson's and could not therefore request Mr. Johnson to terminate the contract. At the trial, plaintiff testified that in his discussion with Mr. Johnson when he entered into the contract, Mr.

Johnson had not told him that defendant had any right to cancel the contract. He then went on to state that there was nothing in the contract to show that, and that in fact it was Mr. Johnson and not the defendant who had canceled the contract. Yet plaintiff brought this suit not against Mr. Johnson, as he at one time contemplated, but against the defendant.

Mr. Johnson testified that in the Spring of 1965 he had again appointed plaintiff an agent and that he did make an effort without success to secure for plaintiff the 8th, 9th and 10th year renewal commissions cut off by termination in 1961 of the prior contract because of "the unusual circumstances."

With respect to Count I, the record amply supports the District Court's findings. There was an arm's length transaction between plaintiff and Mr. Johnson resulting in a contract which clearly provided that claims thereunder were personal claims against Mr. Johnson. Plaintiff lays great stress on the fact that the contract is contained in a form drafted by defendant because although Mr. Hoxie and Mr. Laird testified that use of this form was not obligatory and that modifications could be employed, such modifications would have to be filed with the defendant. We do not agree that this use of a form provided by the defendant renders the contract one between the plaintiff and the defendant. The fact that Mr. Johnson was a general agent of the defendant did not prevent his entering into a contract, as he did here, for himself as principal under established Illinois law. Vail v. Northwestern Mutual Life Insurance Co., First District, 1900, 92 Ill.App. 655, affd. 1901, 192 Ill. 567, 61 N.E. 651. Rutledge v. United Services Life Insurance Co., 84 U.S.App.D.C. 61, 1948, 171 F.2d 27, cert. den. 336 U.S. 953, 69 S.Ct. 883, 93 L.Ed. 1107, and cases there cited from a variety of jurisdictions suggest that this method of operation is frequently employed in the life insurance business. Nor can we imply another contract here in disregard of the express

contract before us. Walker v. Brown, 1862, 28 Ill. 378. Plaintiff's right to commissions on renewal premiums depends upon the contract existing between him and Mr. Johnson. See Couch, Cyclopedia of Insurance Law, 2d ed. 1960, § 26:400 and cases there cited.

The contract was terminated pursuant to its own terms effective June 1, 1961 and hence no commissions or persistency fees were payable for the 8th, 9th and 10th years of policies of issue date prior to plaintiff's 58th birthday; the compensation and fees claimed by plaintiff all fell within that description; the subsequent contract of 1965 did not provide for any reinstatement of these commissions and fees.

■ There is no basis for setting aside these findings as "clearly erroneous." Rule 52(a), Federal Rules of Civil Procedure, Shapiro v. Rubens, 7 Cir., 1948, 166 F.2d 659, 666; Kemnitz v. United States, 7 Cir., 1966, 369 F.2d 389, 390. We agree with the District Judge that the defendant has not been shown to be unjustly enriched. In addition to plaintiff's allegations that defendant gained savings from non-payment of the 8th, 9th and 10th year fees, the Trial Judge also heard evidence from Mr. Hoxie and Mr. Laird that these savings were far outweighed by training and other expenses incurred by termination of an agent.

■ With respect to Count II on malicious interference, plaintiff contends that even if the statute of limitations were timely pleaded in response to plaintiff's amended Count II, filed by leave of Court, which primarily changed only the *ad damnum* to $1 million punitive damages and $150,000 actual damages, that defense does not apply because the cause of action arose not from the termination of the contract on June 1, 1961, alone, but from the times the 10th year commissions would have been payable had the contract not been terminated. We do not find this theory tenable. If a breach was induced, the injury occurred when the breach occurred—at the time of the termination of the contract. There could not be a continuous inducement to carry on continuing breaches after the breach had in fact occurred. Howard T. Fisher & Assoc., Inc. v. Shinner Realty Co., First District, First Division, 1960, 24 Ill.App.2d 216, 224–226, 164 N.E.2d 266, 271–272. Plaintiff sees *Fisher* as distinguished by its facts because if none of the policies here in question had continued in force (for whatever reason) until the 8th year renewal, then no fees would have been due therefor and plaintiff would not have been injured. We do not agree that this circumstance requires that the statute of limitations run from the date when the last of the various commissions and fees would have become payable had the contract never been terminated.

■ Plaintiff argues that it was highly prejudicial to permit this affirmative defense to be interposed at a late date after plaintiff had expended large sums in discovery and preparation for trial and that justice did not require the pleading of this affirmative defense in answer to a mere increase in the *ad damnum*, albeit a very large increase. We have weighed the hardship to the plaintiff in this case, as we are sure the District Court did, but after due deliberation, we do not conclude that the District Judge abused his discretion in allowing the defense to stand. This is not a case where the defendant has waived the defense. In Roe v. Sears Roebuck & Co., 7 Cir., 1943, 132 F.2d 829, and Wagner v. Fawcett Publications, 7 Cir., 1962, 307 F.2d 409, on which plaintiff relies, the defendant having answered and failed to plead the statute of limitations, sought to raise this defense later by motion. The defendant in *Roe* never sought leave of Court to be relieved from its default. Plaintiff, himself an attorney, tardily filed his Count II long after the statutory limitations period had lapsed and then sought to amend that very Count to increase damages shortly before trial. Under these circumstances we are unable to conclude that justice was not served by permit-

ting defendant to amend its answer to that Count to include the statute of limitations. Cf. Emich Motors Corp. v. General Motors Corp., 7 Cir., 1956, 229 F.2d 714, 717. Groninger v. Davison, 8 Cir., 1966, 364 F.2d 638, 640.

As noted, plaintiff clearly doubts that the motives asserted at the time of the trial constituted the actual motivation for the defendant's request that plaintiff's contract be terminated, but there is no evidence of any other motives. There is no showing of any malice, even of inferred "legal malice" as plaintiff contends. Considering the evidence in the light most favorable to plaintiff, we believe the record before us supports a finding that the evidence failed to prove a cause of action against defendant, any malicious interference by defendant, or any basis for awarding punitive damages—apart from the fact that the statute of limitations had run.

We find no error in the District Court's order allowing defendant's motion for a directed verdict on Count II. Unlike the Court in National Gas Appliance Corp. v. Manitowoc Co., 7 Cir., 1962, 311 F.2d 896, the Trial Judge here did not direct a verdict at the close of the plaintiff's case but only after the conclusion of all the evidence.

Plaintiff's surprise by the District Court's refusal to strike the defense of the statute of limitations would not convert the District Court's denial of a postponement (to allow search for evidence of waiver during negotiations for settlement, which plaintiff describes in his brief as occurring prior to July 8, 1965, before the statute had run) into an abuse of discretion in these circumstances. The jury had not only been selected but had already heard evidence.

The taxing of costs is a matter within the Trial Judge's discretion. Title 28 U.S.C. § 1920(2), Independent Iron Works Inc. v. United States Steel Corp., 9 Cir., 1963, 322 F.2d 656, 676 *et seq.* In this case the District Judge held hearings as a result of which changes were made in the costs as initially

taxed by the Clerk. We find no abuse in the Court's ruling that the expense of the transcript, to which plaintiff takes exception, should properly be taxed as costs, but on a non-daily basis.

We have considered all points and authorities to which our attention has been drawn. We are satisfied that the judgment of the District Court must be affirmed.

Affirmed.