485 F.2d 132
 Clifton F. HOFFMAN, Appellant,
v.
STERLING DRUG, INC., a Corporation and Winthrop
Laboratories, Inc., a Corporation and division of
Sterling Drug, Inc.
Clifton F. HOFFMAN,
v.
STERLING DRUG, INC., a Corporation and Winthrop
Laboratories, Inc., a Corporation and division of
Sterling Drug, Inc., Appellants.
 Nos. 72-1257 to 72-1259.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 12, 1973.
Decided Aug. 8, 1973.
As Amended Aug. 24, 1973.
 
 Joseph D. Shein, Shein, Mele & Brookman, William B. Anstine, Jr., Anstine & Anstine, Philadelphia, Pa., for appellant in Nos. 72-1257, 72-1258 and appellees in 72-1259.
 W. Bradley Ward, Schnader, Harrison, Segal & Lewis, Frank B. Boyle, Philadelphia, Pa., for appellee in Nos. 72-1257, 72-1258 and appellants in No. 72-1259.
 Before BIGGS, HASTIE and HUNTER, Circuit Judges.
 OPINION OF THE COURT
 BIGGS, Circuit Judge.
 
 
 1
 In this diversity action[1] Hoffman, plaintiff-appellee cross-appellant, sought to recover damages for serious and permanent injuries allegedly sustained as the result of ingesting the drug chloroquine phosphate, which was manufactured by Sterling Drug, Inc. and Winthrop Laboratories, Inc., and marketed under the trade name of Aralen. Count I of the complaint charged that the defendants were negligent insofar as they failed to properly test the drug prior to placing it on the market, failed to adequately warn users or the medical profession of the dangers inherent in their product, and violated Sections 301, 501, and 502 of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. Secs. 331, 351, 352. Count III alleged that the defendants were strictly liable in tort,[2] and Count IV charged the defendants with fraudulently, falsely and deceitfully misrepresenting and concealing the true state of knowledge about the safety of the drug, or, in the alternative, making such misrepresentations in reckless disregard of reports to them of the harmful nature of the product.[3]
 
 
 2
 After a lengthy trial, the jury returned a verdict in the plaintiff's favor in the amount of $437,000, and judgment was entered on the verdict. The defendants' motion for a new trial was denied by the district court,[4] and the plaintiff's motion for a retrial on the issue of punitive damages was also denied. These appeals followed.
 
 
 3
 The plaintiff's relevant medical history dates back to the early 1950's, when, while seeing a Dr. Kammer for a gastric condition and arthritic pains, Dr. Kammer recommended that plaintiff see a dermatologist about a rash on his face. The plaintiff was referred to Dr. Ernest Markey, an osteopath specializing in dermatology, who diagnosed the plaintiff's condition as lupus erythematosus and in May of 1957, prescribed Aralen as treatment. Dr. Markey treated the plaintiff for 13 months, from April, 1957 to May, 1958, until Dr. Kammer referred plaintiff to Dr. Milton Cohen, a medical doctor and dermatologist. Dr. Cohen treated the plaintiff from June, 1958 until March, 1964, and he too prescribed Aralen. Dr. Cohen testified[5] that he was aware of and informed the plaintiff of the possibility of eye damage from the prolonged use of chloroquine, that he questioned the plaintiff about his sight on each visit, and on several occasions suggested to the plaintiff that he see an eye doctor for a slit-lamp examination, but that he did not know that eye damage would be irreversible.[6] The plaintiff stopped seeing Dr. Cohen in March, 1964, and continued taking Aralen under a refillable prescription from Dr. Cohen until June, 1965, when Dr. Ludwig, another doctor consulted by the plaintiff concerning his arthritic type of pain, advised him to stop taking the drug.
 
 
 4
 It was in 1965 or 1966 that the plaintiff began to experience problems with his eyesight. Plaintiff's optometrist, Dr. Cruse, testified that prior to 1966, plaintiff's vision was correctable to normal or what is termed 20/20 vision. Dr. Cruse stated that in June, 1966, plaintiff's vision had deteriorated to approximately 20/30 in each eye, and plaintiff's eyesight continually worsened.[7] Dr. McHenry, an ophthalmologist, examined the plaintiff in December, 1965, at which time he found that plaintiff's vision was 20/30 in each eye and could not be corrected to 20/20. In 1970, Dr. McHenry concluded that the plaintiff suffered from chloroquine retinopathy, and in 1971, he found his vision to be 10/200 in each eye, which rendered him legally blind under Pennsylvania law.[8]
 
 
 5
 Chloroquine retinopathy is a damaged condition of the retina which can result from the long continuous use of chloroquine drugs. That permanent retinal damage might result from the use of such drugs was not suspected when the defendants first started marketing Aralen in 1946. Aralen had been approved by the Food and Drug Administration for the treatment of malaria. Commonly observed side effects noted in the 1940's and early 1950's included nausea, abdominal cramps, and some instances of blurring of vision. Visual disturbances disappeared when chloroquine treatment was discontinued, leading investigators to conclude that the condition was transitory. By 1953, reports of the successful use of Aralen in the treatment of rheumatoid arthritis and lupus erythematosus, the skin disease which the plaintiff suffered from, began to appear. In 1955, defendant Winthrop Laboratories, Inc., published and distributed a pamphlet which discussed Aralen treatment for lupus erythematosus.[9] In the same year, Winthrop submitted for publication in the Physician's Desk Reference[10] information concerning Aralen's use in the treatment of lupus erythematosus. Finally, on July 25, 1957, defendants filed a supplemental new drug application with the FDA seeking approval to advertise and sell Aralen for use in the treatment of rheumatoid arthritis and purportedly for lupus erythematosus as well.[11] Conditional FDA approval was obtained three weeks later, with final approval following on October 2, 1957.
 
 
 6
 Suspicion that chloroquine use might permanently damage the retina began to arise circa 1957. An article by Dr. Goldman and Dr. Preston, entitled "Reactions to Chloroquine Observed During Treatment of Various Dermatologic Disorders,"[12] stated that chloroquine was suspected of severe fundal (retinal) changes but this could not be proved. In 1959, the suspicion was strengthened by an article entitled "Retinopathy Following Chloroquine Therapy" by Hobbs, Sorsby, and Freedman.[13] This report explained that "[i]n the doses used to suppress or treat malaria, the toxic effects of chloroquine and its derivatives are only minor. . . . Since in both lupus erythematosus and rheumatoid arthritis the effective dose commonly exceeds that used for malaria, and the drug is administered for much longer periods, it is not surprising that toxic effects have been reported. . . .
 
 
 7
 "Recently we have seen changes of a much graver character, with visual damage which, in some cases at least, is evidently irreversible. These patients . . . were under treatment with chloroquine compounds for lupus erythematosus and rheumatoid arthritis."[14]
 
 
 8
 The article concluded, after a discussion of certain case reports, "On present evidence, the retinopathy here described results from treatment with chloroquine compounds. . . ."[15] Defendants' witness, Dr. Rice, testified that this article made "it very likely, or quite likely, that chloroquine might be involved in the production of retinopathy. This I say 'likely' because the drug that they used was not Chloroquine Phosphate as sold by Winthrop but was Chloroquine Sulfate and which might have an entirely different toxity than Chloroquine Phosphate."[16] Numerous letters were also received by defendants from physicians during this period (1956-1960) reporting loss of vision, field changes, and fundus changes in patients being treated with Aralen and inquiring into the possibility that Aralen might be the cause. Defendants made reference to the Hobbs, Sorsby, and Freedman article in their 1960 product literature, and, after numerous reports in medical literature of irreversible retinal damage following chloroquine treatment, defendants included in their 1962 product literature a warning that retinal changes "have been reported as rarely occurring within several months to several years of chloroquine therapy" and pointed out "the necessity of periodic visual field examinations in order to detect early changes during prolonged treatment with the drug."[17] In February, 1963, defendants sent out letters to physicians, 248,000 in all, warning of occular complications from the use of the drug and of the need for initial and periodic ophthalmologic examinations of the patient.[18]
 
 
 9
 Defendants have appealed the judgment of the district court at our No. 72-1259, asserting that the trial court committed reversible error (1) in submitting to the jury the issue of whether the defendants violated the Federal Food, Drug and Cosmetic Act, (2) in admitting certain evidence relevant to alleged withholding from the FDA of letters of inquiry and reports from physicians, (3) in submitting to the jury the issue of whether the defendants sold Aralen without adequately testing it to discover harmful side effects, and (4) in charging the jury that the defendants were under a duty to warn treating as well as prescribing physicians about the danger of retinal damage. The defendants also contend that (5) the jury's award in the amount of $437,000 is excessive. Plaintiff has appealed at our Nos. 72-1257 and 72-1258 insofar as the district judge refused to permit the jury to consider the issue of punitive damages and refused to tax as costs certain of the plaintiff's expenses.
 
 I.
 
 10
 Defendants maintain that there was no evidence of a violation of the Federal Food, Drug and Cosmetic Act or the regulations thereunder and that, even if there was such evidence, any violation was not the proximate cause of the plaintiff's injuries. Therefore they assert error in the submission of this issue to the jury.
 
 
 11
 Section 301 of the Act as amended, 21 U.S.C. Sec. 331, provides: "The following acts and the causing thereof are prohibited: * * * (d) The introduction or delivery for introduction into interstate commerce of any article in violation of section 404 or 505." Section 505, as amended, 21 U.S.C. Sec. 355, states: "(a) No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an application filed pursuant to subsection (b) is effective with respect to such drug. * * *"
 
 
 12
 As hereinbefore mentioned, a new drug application had been approved by the FDA in 1946 for the marketing of Aralen for use in the treatment of malaria. The newness of a drug within the meaning of the Act,[19] however, may arise by reason of a new or different recommended use for the drug even though the same drug may not be a new drug when used for another disease. Merritt Corporation v. Folson, 165 F. Supp. 418 (D.D.C.1958). See also 21 C. F.R. Sec. 1.109(d) (1955) and 21 C.F.R. Sec. 130.1(h)(4) (1972); Developments in the Law, The Federal Food, Drug and Cosmetic Act, 67 Harv.L.Rev. 632, 679 (1954). The plaintiff thus attempted to show that offering Aralen to the public for use in the treatment of lupus erythematosus rendered it a "new drug" and required prior approval of the FDA. The FDA regulations then in effect, 21 C.F.R. Sec. 1.110(d) (1955), provided for FDA approval of "any proposed change in the conditions under which such drug is to be used."[20]
 
 
 13
 The evidence presented plainly warranted the trial judge in submitting this issue to the jury. Defendants' witness, Dr. Rice, testified on cross-examination that prior to 1957 the sole authorized use of Aralen was for the treatment of malaria and amebiasis and that any change in the authorized use would require the filing of a supplemental application. It was also brought out that Defendants' Exhibit 134, a letter dated August 15, 1946 from the FDA to Winthrop, advised Winthrop that "the application is effective with respect to the use of this drug [Aralen] only under the conditions prescribed, recommended and suggested in the application. Should you decide to alter the composition, or dosage, or method or duration of administration or application, or other condition of use, an appropriate amendment to the application should be submitted for consideration."[21] There was also evidence that as early as 1955, defendants recommended Aralen for use in the treatment of lupus erythematosus. We think that the jury was entitled to consider this evidence and that it could properly find that, contrary to law, the defendants offered Aralen to the public for use in the treatment of lupus erythematosus without first securing approval of the FDA.
 
 
 14
 Nor do we agree with the defendants' contention that the alleged violation of the Act or FDA regulations was in no way connected with the plaintiff's injury. The record discloses that Dr. Markey prescribed Aralen for the plaintiff's lupus erythematosus several months before the FDA approved such use. Viewing the evidence in the light most favorable to the plaintiff and giving him the benefit of every favorable inference, as we are required to do. O'Neill v. Reading Co., 306 F.2d 204 (3 Cir. 1962), we think that a jury question was presented as to whether Dr. Markey was influenced to prescribe Aralen by the defendants' recommendations of the drug for use in the treatment of lupus erythematosus made prior to FDA approval of the supplemental new drug application, and whether these allegedly unlawful recommendations were therefore a substantial factor in causing the plaintiff's injury.
 
 
 15
 Defendants also contend that the district court's charge failed to state the applicable provisions of the Act or FDA regulations, thereby permitting the jury to speculate as to what the law required and what facts would constitute a violation thereof. It is the general rule, however, that an appellate court will not consider trial errors to which no objection was made. F.R.Civ.P. 51 states that "[n]o party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires . . ., stating distinctly the matter to which he objects and the grounds of his objection." This rule is not inexorable, and in rare instances, where the error is fundamental and results in a miscarriage of justice, this court will notice such error despite counsel's failure to comply with Rule 51. Pritchard v. Liggett and Myers Tobacco Co., 350 F.2d 479 (3 Cir. 1965), cert. denied, 382 U.S. 987, 86 S.Ct. 549, 15 L. Ed.2d 475 (1966); Paluch v. Erie Lackawanna Railroad Co., 387 F.2d 996 (3 Cir. 1968); McNello v. John B. Kelly, Inc., 283 F.2d 96 (3 Cir. 1960).
 
 
 16
 In the case at bar, counsel for the defendants neither requested instructions in this regard nor objected to the asserted inadequacies in the charge.[22] Assuming arguendo that the instructions given were inadequate, we think that the circumstances do not justify a departure from Rule 51, especially where, as here, the jury was informed as to the substance of what FDA required.[23]
 
 II.
 
 17
 The defendants next assert that the testimony of Mr. Jordan concerning the "Bagnall letter" was inadmissible and highly prejudicial. In October, 1958, Dr. Bagnall wrote a letter to Dr. Rice, the Director of Medical Research for the defendants, in which he referred to two patients who were on long-term Aralen therapy and who had developed eye complications. "The first of these was a recurring corneal ulceration every time that Aralen was resumed and the decision of everyone concerned was that Aralen was to blame for this unfortunate, but not serious side effect. The second case was . . . a woman who had been on long term therapy for rhuematoid arthritis. . . . [The patient] noticed diminution of vision in one eye and the opthalmologist described macular degeneration of this eye and a central scotoma. This has only recently been observed and whether it continues with withdrawal of Aralen therapy is still to be discovered."
 
 
 18
 Mr. Jordan, the official court reporter in an Aralen case which had been tried in the United States District Court for the Southern District of Mississippi, testified that a photostat of the Bagnall letter and a photostat of a handwritten note had been introduced as a single exhibit in the Mississippi case. The note, dated March 25, 1960, stated as follows: "Do not advise FDA now. Send lit. when reprinted including corneal changes and say it is modified version of what we subm. several months and which they passed on. Discussed w/Dr. Foley & Dr. Rice." Mr. Jordan brought with him a sealed box containing all the exhibits from that earlier trial and, after opening the box in the jury's presence, removed this one exhibit in which the note was attached to the Bagnall letter. Based on this evidence, plaintiff's attorney, in his closing argument to the jury, submitted that "it shows . . . that they [the defendants] were holding back information to make their buck" and "did they not intentionally . . . attempt to conceal this information from the FDA."[24]
 
 
 19
 The defendants attack the admission of Mr. Jordan's testimony apparently for its lack of probative value, arguing that since Mr. Jordan did not know how the photostats of the letter and the note came to be attached or who attached them, the jury could not properly infer any connection between them.[25] Although we find the connection between the letter and the note extremely remote, we believe that the error in admitting this evidence was harmless. F. R.Civ.P. 61. The evidence was relevant to the allegations of fraud and concealment contained in Count IV of the complaint. But the district court judge submitted the case to the jury only on the theories of negligence and strict liability (alleged in Counts I and III of the complaint), and the evidence with regard to these issues was such that the jury's findings on these issues could not have been significantly influenced by admission of evidence on the fraud count.[26]
 
 III.
 
 20
 Defendants contend that the evidence was not sufficient to permit the trial court to submit to the jury the issue whether Aralen was sold for use in the treatment of lupus erythematosus without adequate testing to determine possible harmful side effects.[27] A review of the record more than satisfies us of the sufficiency of evidence in this regard.
 
 
 21
 Dr. Dennis, the man who conducted the testing on behalf of the defendants, testified that only three of the tests concerning the side effects of chloroquine on animals were long-term,[28] i. e., extended longer than one year. The first was a two year test on rats, conducted in 1953 or 1954, and Dr. Dennis disclosed that this test paid no particular attention to and made no special examination of retina.[29] The second study, that of monkeys, was 74 weeks in duration, from March, 1958, to August, 1959. Plaintiff's expert, Dr. Shelanski, testified that this test was inadequate for it was based upon an evaluation of Aralen and aspirin "and in no wise can this be interpreted to mean or to be considered effective as a basis for the evaluation of Aralen alone."[30] The third test of the side effects from long-term use of Aralen, conducted on cats, was not until 1968-1969, well after it was known that Aralen could cause retinopathy and well beyond the period of concern in the case at bar, which extends up to 1965. Dr. Dennis stated that the rest of the tests made by defendants, 12-15 in number, were short-term and "were general tests not specifically directed at the eye or the retina."[31]
 
 
 22
 Another of plaintiff's witnesses, Dr. Carr, testified that one study he made in 1964-1965, while at the International Institutes of Health, produced retinal degeneration in rats and that studies made by others from 1963 to 1968 also succeeded in producing retinal changes and retinal damage in animals following ingestion of chloroquine. The point made by Dr. Carr was that such studies were not technologically infeasible ten years earlier.[32]
 
 
 23
 It thus appears to this court that whether adequate testing would have disclosed potentially harmful side effects from the long-term use of Aralen and whether the studies made by defendants were in fact adequate were properly questions for the jury. Defendants' argument that they cannot be accused of negligently failing "to conduct animal studies to show the connection between Aralen and chloroquine retinopathy at a time when the causal connection was not even suspected in the long term use by humans of the drug" is without merit. As was stated by Justice Jackson, dissenting in Dalehite v. United States, 346 U.S. 15, 51-52, 73 S.Ct. 956, 976, 97 L.Ed. 1427 (1953): "This is a day of synthetic living, when to an ever-increasing extent our population is dependent upon mass producers for its food and drink, its cures and complexions, its apparel and gadgets. These no longer are natural or simple products but complex ones whose composition and qualities are often secret. Such a dependent society must exact greater care than in more simple days and must require from manufacturers or producers increased integrity and caution as the only protection of its safety and wellbeing. Purchasers cannot try out drugs to determine whether they kill or cure . . . Where experiment or research is necessary to determine the presence or the degree of danger, the product must not be tried out on the public, nor must the public be expected to possess the facilities or the technical knowledge to learn for itself of inherent but latent dangers. The claim that a hazard was not foreseen is not available to one who did not use foresight appropriate to his enterprise." In view of the number of letters, beginning in 1956, from physicians reporting visual disturbances and retinal changes in patients using Aralen, and medical literature appearing in the late 1950's and early 1960's, we think it at least open to question whether defendants used "foresight appropriate to [their] enterprise."
 
 IV.
 
 24
 It is next asserted by the defendants that the trial judge improperly instructed the jury that they had a duty to warn both the prescribing and the treating physicians, and that this was prejudicial because the prescribing physician, Dr. Cohen, was already aware of the danger to the eye.[33] Citing Incollingo v. Ewing, 444 Pa. 263, 282 A.2d 206 (1971), they maintain that Pennsylvania law requires warning only to the prescribing doctor. We disagree.
 
 
 25
 *****
 
 
 26
 * * *
 
 
 27
 The Court in Incollingo, 444 Pa. at 288, 282 A.2d at 220, stated: "Since the drug was available only upon prescription of a duly licensed physician, the warning required is not to the general public or to the patient, but to the prescribing doctor. See Stottlemire v. Cawood, 213 F.Supp. 897, 899 (D.C.1963)." But the Court was not faced with the question now before us, for there was no treating physician in Incollingo, and the plaintiff's doctors in that case were both prescribing physicians. We think that the Court was not attempting to establish a class of doctors to whom a warning must be given, but rather sought to establish the most effective means by which a warning could reach the patient, i. e., by a warning to the patient's doctors instead of communication to the general public. "A warning . . . given . . . to those doctors might . . . have avoided the tragedy which occurred in this case." 444 Pa. at 293, 282 A.2d at 222. The use of the Stottlemire case as authority supports this view, for Stottlemire held only that warning need not be given to the public. We conclude that in defining the scope of a drug company's duty to warn, Pennsylvania would view it as insignificant whether the doctor is a prescribing or treating physician, the important consideration being that the warning best reach the patient. Indeed, this is the policy behind the rule stated not only in Incollingo, but in numerous other cases as well.[34] "In the [use] of prescription drugs . . . it is difficult . . . for the manufacturer, by label or direct communication, to reach the consumer with a warning. A warning to the medical profession is in such cases the only effective means by which a warning could help the patient." Davis v. Wyeth Laboratories, Inc., 399 F.2d 121, 130 (9 Cir. 1968). (Emphasis added). Certainly in the case at bar, a warning given to Dr. Kammer, the treating physician, might have avoided the tragedy which occurred.
 
 
 28
 Our interpretation of Incollingo is buttressed by the general rule in Pennsylvania that, in defining the extent of the seller's duty to inform the consumer of dangers in a product, "every reasonable precaution suggested by experience and the . . . dangers of the subject ought to be taken." See Thomas v. Arvon Products Company, 424 Pa. 365, 370, 227 A.2d 897, 900 (1967). (Emphasis added). A warning to treating as well as prescribing physicians is within this guideline. In short, Incollingo is not a case in point, and in view of the policy represented therein, we hold that the district court's charge was correct.
 
 V.
 
 29
 The defendant's remaining contention is that the verdict was excessive, speculative, and without support insofar as it included an award for loss of future earnings. The jury's award in respect to this element of damages represents compensation for the deprivation of pecuniary benefits reasonably expected to result from the plaintiff's continued earning capacity. It is measured by the present cash value of the loss which the evidence shows with reasonable certainty will result from his injury. See Russell v. City of Wildwood, 428 F.2d 1176, 1181-1182 (3 Cir. 1970). Although the determination of such damages often involves a host of uncertain contingencies, the verdict must still have its basis in evidence, not conjecture.
 
 
 30
 Plaintiff had been employed by Mr. Lenker, a registered architect, as an architectural draftsman and designer from the time he graduated from college with a degree in architecture in 1955, until May 1969, when his deteriorating vision made it impossible for him to continue in his occupation. His salary from 1962 through 1967 averaged approximately $6,500 per year, and in 1968, it was raised to $8,100. Due to the impending retirement of Mr. Lenker, it became relevant to determine what employment was available in the York County area.
 
 
 31
 Two architects, Kimmons and Martin, testified as to the salary which an architectural draftsman of plaintiff's experience might receive. Kimmons placed the plaintiff in the $12,000 to $14,000 range at rates existing at the time of trial, and stated that the rate of salary increase in the York area had been 10% for the past few years and averaged about 6% over the past five years.[35] Martin testified that he would place plaintiff in the $11,000 range which would increase to $14,000 in a couple of years.[36]
 
 
 32
 Based on this testimony, Dr. Schoenwald, an economist, presented his mathematical calculations of the present value of plaintiff's projected loss of future earnings. Using the testimony of Kimmons, Schoenwald computed plaintiff's loss at $680,000, which, reduced to present worth, amounted to $306,000. A calculation based on Martin's testimony presented a loss of $640,000, which, reduced to present value, came to $288,000. Using plaintiff's 1968 salary of $8,100, the loss was $529,000 and the present value $239,000. In all these calculations, Schoenwald assumed that plaintiff would work for his full life expectancy, 26 years, 3 months,[37] and would receive a 6% annual salary increase throughout that period.[38]
 
 
 33
 As stated earlier, the jury returned a verdict of $437,000. Defendants maintain that this award was improperly influenced by Schoenwald's figures representing plaintiff's "fictional career." They argue that there was no evidence to support Schoenwald's assumption that the plaintiff's salary would increase at 6% annually, which, as they brought out on cross-examination, would result in a salary of $47,000 after 26 years.
 
 
 34
 Dr. Schoenwald explained the basis for his assumption of a 6% annual salary increment as follows: "Well, it is normal for people to receive wage rate increases. Based on the testimony from Thursday, the norm in this type of occupation in this area is six percent a year."[39] The testimony referred to was that of Kimmons, who stated that salaries for architectural draftsmen in the York area had increased by approximately 6% over the previous five years. Does this testimony that wages increased by 6% over the past five years constitute "well-founded evidence" that Hoffman would have received a 6% yearly salary increase for the next 26 years, Magill v. Westinghouse Electric Corporation, 464 F.2d 294, 300 (3 Cir. 1972), or do such future increments represent conjecture or speculation?
 
 
 35
 Although offered in terms of continuing increases in wage rates, as opposed to a continuing decline in the value of the dollar, the testimony in question reflects a continuing inflationary spiral. We note that inflationary considerations have been almost universally rejected as a factor in computing future losses. See Sleeman v. Chesapeake and Ohio Ry. Co., 414 F.2d 305 (6 Cir. 1969); Raines v. New York Central Railroad Company, 129 Ill.App.2d 294, 263 N.E.2d 895 (1970), rev'd on other grounds, 51 Ill.2d 428, 283 N.E.2d 230 (1972), cert. denied, 409 U.S. 983, 93 S.Ct. 322, 34 L.Ed.2d 247 (1972). In any event, no evidence was introduced in the case at bar as to the probability or magnitude of future inflationary trends and there was no evidence projecting inflation over a long period of time. While it is true that plaintiff's expert witness, Schoenwald, was an economist by profession and plaintiff offered to prove through him projections as to the declining value of the dollar,[40] the district court refused to permit such evidence, and as a result, Schoenwald was only utilized, as was the expert witness in Magill, to perform the actuarial function of calculating present values. The propriety of Schoenwald's use of the 6% "earnings increase factor" is thereby governed by our recent decision in Magill, supra.
 
 
 36
 In Magill, an actuary testified as to the present worth of Magill's future earnings capacity using a 3 1/2% earnings increase factor. The earnings increase factor was said to be a factor used by actuaries to estimate future earnings in arriving at the cost of pensions and the witness' accounting firm used a 3 1/2% figure. Despite the testimony from another witness that the hourly wage in Magill's job had increased by 4 3/4% per year during the four year period prior to trial, the court held that "the lack of foundation for the earnings increase factor was a fatal defect requiring a new trial . . . limited to the issue of damages." 464 F.2d at 300-301. Similarly in the case at bar, we do not think there was a substantial factual basis for the assumption that salaries of architectural draftsmen in the York area would increase at 6% per year for the next 26 years. Both the present case and Magill are marked by the total absence of any evidence of probable future salary or economic trends. Hoffman's counsel has isolated a five year period in the late 1960's, one of the more inflationary periods in our history, and used it as the basis for a projection of over 26 years without introducing any evidence to support such a projection. See also Frankel v. United States, 321 F.Supp. 1331 (E.D.Pa.1970), aff'd, 466 F.2d 1226 (3 Cir. 1972), where the plaintiff presented evidence that the cost of mental institutional care in the Philadelphia area had increased 5 1/4% per year for the previous ten years and then sought to use a cost increase factor in the calculation of this element of her damages. The district court ruled out the consideration of future cost increases as being speculative, and we expressed our agreement "with the district court's analysis and conclusion." 466 F.2d at 1229. In short, the projected 6% per year earnings increase in the present case is speculation, requiring a new trial on the question of damages.
 
 VI.
 
 37
 We turn next to the issues raised by the plaintiff in his cross-appeal. It is first asserted that the trial court erred in refusing to submit the issue of punitive damages to the jury. No claim for punitive damages was specifically made in the Complaint, though in Count IV plaintiff alleged facts, which if proven, would support such an award.[41] During the course of trial, plaintiff's counsel moved to amend the ad damnum clause of the Complaint to include a claim for punitive damages, and the district court, pointing to a lack of evidence that would warrant the amendment, denied the motion.[42] Plaintiff also requested an instruction to the jury on punitive damages, excepted to the court's failure to charge on this issue, and filed a posttrial motion for a new trial as to punitive damages. Due to the view we take of the evidence, we conclude that leave to amend the Complaint should have been granted F.R.Civ.P. 15, and that the failure to submit the issue to the jury constituted error requiring a new trial.
 
 
 38
 Pennsylvania has adopted the rule of punitive damages as set forth in Sec. 908 of the Restatement of Torts and the comments thereunder. See Chambers v. Montgomery, 411 Pa. 339, 192 A.2d 355 (1963); McSparran v. Pennsylvania Railroad Company, 258 F.Supp. 130 (D. C.1966). Section 908(1) provides, "'Punitive damages' are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct." Comment (b) states, "Punitive damages are awarded only for outrageous conduct, that is, for acts done with a bad motive or with a reckless indifference to the interests of others." See also Thompson v. Swank, 317 Pa. 158, 176 A. 211 (1934).
 
 
 39
 The plaintiff charges defendants with wilfully and/or recklessly affecting the state of the art, i. e., the state of medical knowledge, by failing to advise the FDA and the medical profession of the danger of chloroquine retinopathy when they knew of such danger and by misrepresenting and grossly understating their knowledge of the danger from the drug. This most serious charge goes to the adequacy of the warnings issued by the defendants and will be examined in this light.[43] Appendix A to this opinion sets out (I) the reported developments in medical knowledge relating to chloroquine retinopathy and (II) reports received by defendants from physicians suggesting retinal damage in patients, and is relevant to the question of notice to the defendants. Appendix B attached to this opinion describes defendants' responses, that is, their attempts to warn of the danger of retinal damage.
 
 
 40
 A review of the evidence convinces us that the jury should have been allowed to decide whether the warnings issued by defendants were so inadequate as to constitute a reckless disregard of the danger to the public of irreversible retinal damage. Dr. Shelanski testified that by 1960, the literature of the period was sufficient for defendants to have known that chloroquine could cause serious and permenent retinal changes.[44] He stated that the Hobbs, Sorsby, and Freedman article, published in October, 1959, established a definite connection between the drug and retinal changes. Dr. Carr also testified that it was "obvious" from this article that retinopathy was a toxic reaction of chloroquine and would progress even after cessation of the drug.[45] Numerous other articles of similar nature appeared in medical literature and were especially condemning during 1961 and 1962.[46] Letters and reports from physicians were also received by defendants which suggested retinal damage in their patients using chloroquine.[47] The existence of a relationship between chloroquine and retinal changes was undoubtedly known by defendants to be at least a possibility by 1960, and the jury could well have determined that defendants knew that such a relationship was a certainty by then, or by 1961, or by 1962. Whether defendants' product literature and statements in the Physician's Desk Reference misrepresented and understated the state of their knowledge during this period, and if so, whether that would constitute a reckless indifference to the public's safety, are, we think, questions which the jury should have been allowed to pass upon.
 
 
 41
 Moreover, during 1960-62, defendants' statements concerning retinal damage (which they maintain were adequate warnings) were limited to product cards and promotional brochures.[48] This literature was distributed by defendants' detail men, whose function it was to visit physicians, discuss the company's drugs, and leave the product card or brochure behind with the doctor. Mr. Abram, the detail man for the territory involved here, testified that he would discuss a certain drug and offer to leave behind the product literature only if he knew that the physician was using that drug in his practice, and if the doctor never asked questions about the drug or mentioned the drug to him, he would have no way of knowing whether the doctor used it.[49] In addition, some doctors did not take the time to speak to detail men, some did not always accept the product cards and brochures offered, and some did not always listen to what the detail men said about a drug.[50] Nor was mailing drug literature to physicians necessarily an effective way to reach them. Dr. Markey testified that he received around 400 pieces of drug mail per month and did not read it all, and although he stated he would probably read those pieces about drugs which he used,[51] the jury could reasonably have found that a considerable amount of such literature winds up in the wastebasket and is not adequate to advise doctors concerning matters of utmost importance. Under the foregoing circumstances, we think the adequacy of using product cards and brochures to transmit important warnings about Aralen to the medical profession or even to that segment of the profession using Aralen in their practice was seriously called into question.
 
 
 42
 Defendants must be charged with knowledge of the workings of the distribution system by which they chose to state the dangerous effects of Aralen and the short-comings therein. Their duty was to warn of retinal damage in a manner which could be expected to alert the medical profession. The Physician's Desk Reference was one means by which defendants could have more effectively reached the medical profession, yet they neglected to include any mention of retinal damage in the side effects listed therein until 1963.[52] A letter marked "Important Drug Precautions" would also have better alerted physicians, but defendants did not send such a letter until February, 1963, and even this 1963 letter was ambiguous and hardly as strong as it might have been.[53] Thus the evidence tends to show that defendants, knowing of the danger of chloroquine retinopathy, knew or should have known that their mode of communicating warnings would not effectively reach the medical profession. Whether this failure to take action reasonably calculated to warn physicians of a risk of great magnitude was in reckless disregard of the public's health should also have been submitted to the jury.
 
 
 43
 A new trial is therefore required on the issue of punitive damages.
 
 VII.
 
 44
 The plaintiff also seeks reversal of the district court's disallowance of mileage fees for his witnesses in excess of 200 miles and the cost of obtaining a daily transcript of the trial record.[54] The allowance of such costs rests primarily in the discretion of the trial court, Marcus v. National Life Insurance Company, 422 F.2d 626 (7 Cir. 1970). Since we do not believe that the ruling was an abuse of discretion, we will not interfere with it.
 
 
 45
 For the foregoing reasons, the case will be remanded to the district court for a new trial on the issue of punitive damages and also as to the amount of compensatory damages, and in all other respects, the judgment of the district court will be affirmed.
 
 APPENDIX A
 
 46
 I. COMPENDIUM OF EVIDENCE OF REPORTED DEVELOPMENTS IN KNOWLEDGE OF THE SIDE EFFECTS OF CHLOROQUINE PHOSPHATE ON THE RETINA-1957-1962.
 
 
 47
 1957: Drs. Goldman and Preston reported that in two patients severe retinal changes developed after treatment with large doses of chloroquine phosphate for lupus erythematosus in their article, "Chloroquine in Treatment of Dermatologic Disorders" (Plaintiff's Exhibit 57-1).
 
 
 48
 Dr. Cambiaggi also reported a case of retinal changes in his article, "Unusual Ocular Lesions in a Case of Systemic Lupus Erythematosus" (Defendants' Exhibit 5), but attributed the cause to lupus erythematosus since discontinuation of chloroquine did not result in improvement.
 
 
 49
 1959: Drs. Hobbs, Sorsby, and Freedman reported retinal damage in three patients who had been treated with chloroquine for lupus erythematosus and rheumatoid arthritis (Plaintiff's Exhibit 59-1, "Retinopathy following Chloroquine Treatment"), and concluded that the retinopathy resulted from treatment with chloroquine. They warned against prolonged chloroquine therapy and advised periodic ophthalmic examination.
 
 
 50
 Central scotoma and macular degeneration from the use of chloroquine by a patient was reported by Dr. Fuld in letter published in Lancet. (Plaintiff's Exhibit 59-2) Dr. Fuld expressed his belief that the damage probably was irreversible and was the direct result of two and one-half years of chloroquine treatment, and he concurred with the Hobbs article's warning against prolonged chloroquine treatment.Drs. Sternberg and Laden reported bilateral macular degeneration in a patient treated with chloroquine. (Plaintiff's Exhibit 59-3), "Discoid Lupus Erythematosus: Bilateral Macular Degeneration Due to Chloroquine").
 
 
 51
 1960: A case of retinopathy caused by an overdose of chloroquine sulphate was reported in a French journal (Plaintiff's Exhibit 60-1, see transcript at 235-36).
 
 
 52
 1961: In an article entitled "Ocular Lesions after Treatment with Chloroquine," (Plaintiff's Exhibit 61-3) Drs. Hobbs, Eadie, and Somerville reported that five patients taking the drug had serious retinal defects. Three other cases personally known to them from colleagues were also discussed, and the apparent irreversibility of such retinal changes was noted. The authors recommended that treatment with chloroquine should be of limited duration, and where prolonged treatment is essential, it should be interrupted and the drug withdrawn for several weeks.
 
 
 53
 Dr. Rebello of Cincinnati, in an article entitled "Ocular Reactions to Antimalarial Drugs" (Plaintiff's Exhibit 61-5), discussed four cases of retinopathy in patients who had received chloroquine therapy. A strong plea was made for frequent periodic opthalmological examinations of patients on chloroquine therapy due to the hazard of serious and permanent visual damage.
 
 
 54
 Dr. Leopold, commenting upon the Rebello and the Hobbs, Eadie, and Somerville articles in Survey of Ophthalmology (Plaintiff's Exhibit 61-1), stated that clinical evidence of retinal changes in persons receiving chloroquine for long periods was accumulating and that the findings appeared to be more than an idiosyncracy. Dr. Leopold also emphasized the importance of examining persons receiving long-term chloroquine treatment for retinal changes.
 
 
 55
 Drs. Richards and Wilson published an article entitled "Retinopathy Associated with Chloroquine Phosphate Therapy" (Plaintiff's Exhibit 61-2) in which they discussed the severe retinal damage observed in their patient after two and one-half years of chloroquine therapy for rheumatoid arthritis. On the basis of their observations they deemed it reasonable to include chloroquine in the group of drugs known to cause visual damage, and, noting the apparent permanency of the visual loss, they advised periodic occular examinations of patients on long-term chloroquine therapy.
 
 
 56
 The annual report of the American Medical Association on New and Non-official Drugs (Plaintiff's Exhibit 61-4) reported that in a few patients, prolonged chloroquine therapy had been associated with irreversible retinal damage characterized by constriction of the retinal arteries, retinal edema, macular degeneration, scotomatous vision, and defects of the visual fields.
 
 
 57
 Drs. Ellsworth and Celler reported that retinal damage to three patients following chloroquine therapy was observed by the faculty of the University of Oregon Medical School (Plaintiff's Exhibit 61-6 "Chloroquine Induced Retinal Damage"). They stated that such retinal changes are permanent and may become more intense after stopping the drug, and expressed their belief that chloroquine was the causative agent. The recommendation was made that all doctors prescribing chloroquine for systemic disease should weigh the possibility of inducing permanent retinal damage against the therapeutic benefit.
 
 
 58
 1962: Drs. Henkind and Rothfield reported in an article entitled "Ocular Findings in Patients Receiving Antimalarial Therapy" (Plaintiff's Exhibit 62-3) that of 38 patients who received chloroquine or hydroxychloroquine (Plaquenil) for at least two months, 20% developed fundus lesions.Drs. Sataline and Farmer reported the case of a person who, after only 15 months of chloroquine therapy, developed severe visual-field defects without funduscopic changes. They suggested that these visual disturbances may have represented an early phase of chloroquine retinopathy. (Plaintiff's Exhibit 62-2, "Impaired Vision after Prolonged Chloroquine Therapy").
 
 
 59
 Dr. Ormrod disclosed two additional cases of retinal damage following chloroquine therapy (Plaintiff's Exhibit 62-5, "Two Cases of Chloroquine-Induced Retinal Damage") and concluded that the toxic effects of chloroquine apparently work directly on the retina.
 
 
 60
 In "Chloroquine Macular Degeneration" by Dr. Smith (Plaintiff's Exhibit 62-7), three more cases of retinal damage caused by chloroquine therapy were documented. The retinal lesions, said to be irreversible, were found to be ophthalmoscopically quite similar to those found in earlier reports. Dr. Smith advised that patients on chloroquine therapy should be seen promptly by an ophthalmologist at the earliest sign of visual symptoms.
 
 
 61
 Drs. Penner and Somers reported a patient who developed bilateral macular degeneration while undergoing chloroquine therapy. (Plaintiff's Exhibit 62-8, "Bilateral Macular Degeneration Associated with Chloroquine Therapy"). It was recommended that patients be seen by an ophthalmologist while using chloroquine because of the toxic effects.
 
 
 62
 In a published letter to the editor of the American Journal of Ophthalmology, Dr. Zeller described cases of retinal damage in which the visual loss progressed even after chloroquine therapy was discontinued. (Plaintiff's Exhibit 62-11)
 
 
 63
 "The Medical Letter" published by Drug and Therapeutic Information, Inc., on Aralen, Plaquenil, and Retinopathy (Plaintiff's Exhibit 62-6) reported that retinopathy, the most serious of the toxic effects induced by chloroquine, was apparent from reports of about 30 cases in patients taking chloroquine. The retinopathy was said to be irreversible, with loss of vision progressing even after discontinuance of the drug. It was recommended that ophthalmological examinations should be considered mandatory and should be repeated every three months even if the patient does not complain of visual difficulty.
 
 
 64
 II. COMPENDIUM OF CORRESPONDENCE WITH DEFENDANTS DESCRIBING VISUAL COMPLICATIONS IN PATIENTS TREATED WITH ARALEN-1956-1962.
 
 
 65
 1956: Dr. Richard Weiss of St. Louis reported to defendants' representative that a lupus erythematosus patient being treated with Aralen was slowly losing her eyesight. Dr. Slevin of Winthrop's Medical Department wrote to Dr. Weiss on July 31, 1956 that "a literature review showed that no cases of permanent blindness following Aralen administration have been reported. . . . However, I would not be prepared to take it for granted that blindness could not occur. . . ." (Defendants' Exhibit 21)
 
 
 66
 1957: A letter dated July 18, 1957, from Dr. Rinehart to Winthrop's Director of Medical Research, Dr. Rice, stated in part, "One patient, who without knowledge of the physician increased his intake of Aralen to 2.0 Cm. daily, developed a spastic arteritis of the retinal arterioles . . . and suffered serious visual impairment." (Plaintiff's Exhibit 57-2)
 
 
 67
 Defendants' detail man wrote on Sept. 21, 1957 of a report from a dermatologist, Dr. Appleyard, concerning a lupus erythematosus patient who had been taking Aralen for several months and became blinded for a few hours. (Plaintiff's Exhibit 57-5)
 
 
 68
 1958: An inter-office memorandum dated May 5, 1958, discussed the studies of Aralen and Plaquenil made by Dr. Goldman in which three lupus erythematosus patients developed retinal damage. (Plaintiff's Exhibit 58-14) A letter from Dr. Bagnall dated October 10, 1958, told of a patient on long-term Aralen therapy who developed macular degeneration and central scotoma. (Plaintiff's Exhibit 58-14(b))
 
 
 69
 1959: Dr. Boheimer of Bayer Products Ltd. wrote to defendants' Research Institute on April 27, 1959, concerning Dr. Freedman's report of retinal damage in three persons using chloroquine and Plaquenil. (Plaintiff's Exhibit 59-7)
 
 
 70
 An Ithaca, New York, M.D., Dale B. Pritchard, wrote to Winthrop's Medical Department on May 11, 1959 that a patient taking Aralen for lupus erythematosus for over two years had "loss of vision, field changes and fundus changes which might be consistent with pigmentary degeneration of the retina." (Plaintiff's Exhibit 59-9). A letter from Dr. Nugent dated October 7, 1959, reported swelling of the retinal area and blurred vision in a patient taking Aralen for less than four months. (Plaintiff's Exhibit 59-13)
 
 
 71
 1960: A March 26, 1960, letter from Dr. Heyde in Vancouver, Washington reported dimness of vision and diplopia in a patient taking Aralen. (Plaintiff's Exhibit 60-6)
 
 
 72
 Dr. Burns of Portland, Oregon reported in a letter dated August 15, 1960, that "we have observed pigmentary degeneration of the retina in two patients which appeared to be associated with the administration of chloroquine." (Plaintiff's Exhibit 60-10)
 
 
 73
 Dr. Simpson of Florence, Alabama wrote on October 3, 1960, concerning a patient on Aralen therapy. ". . . . [s]he began to complain of blurred vision, and she was taken off Chloroquine and our Ophthalmologist, at that time, could not see any eye changes. However, we did not put her back on this medication, and the last month she has developed a marked narrowing of the fundal arteries and her vision has become worse." (Plaintiff's Exhibit 60-12)
 
 
 74
 In a letter dated December 13, 1960, a patient on Aralen therapy wrote to Winthrop about "a blurring of the vision" which both she and her mother, who also used Aralen, were experiencing. (Plaintiff's Exhibit 60-14)
 
 
 75
 1961: An inter-office memorandum written by Dr. Foley, dated December 7, 1961, discussed a telephone call he had received from Dr. Scruggs, an ophthalmologist, who reported a case of retinitis after prolonged Aralen therapy (Plaintiff's Exhibit 61-17)
 
 
 76
 1962: A letter dated September 17, 1962, from Dr. Hodsdon reported macular degeneration in a patient on Aralen therapy for six years. (Plaintiff's Exhibit 62-24)
 
 APPENDIX B
 
 77
 WARNINGS BY DEFENDANTS OF THE DANGER OF RETINAL DAMAGE FROM USE OF ARALEN-1959-1963.
 
 
 78
 In the 1959 Edition of the Physician's Desk Reference, defendants listed Aralen's side effects as follows: "Headache, visual distrubances, prurititis, skin rashes, leukopenia, gastrointestinal complaints. Often transient, or subside on withdrawal or reduction of dosage." (Plaintiff's Exhibit 59-22). The product card on Aralen in 1959 warned of "[t]emporary blurring of vision due to interference with accommodation" and advised periodic eye examinations. (Defendants' Exhibit 14) Defendants' promotional booklet being distributed at this time entitled "New Chemotherapy of Rheumatoid Arthritis with Aralen" similarly mentioned the possibility of temporary blurring of vision. (Defendants' Exhibit 12)
 
 
 79
 The side effects listed in the 1960 Physician's Desk Reference were the same as those listed in previous year's. In July of 1960 defendants issued a new product card which contained the following warning:
 
 
 80
 "Retinal vascular response, probably related to idiosyncrasy and comparable to that observed with quinine, quinidine, salicylic acid and some other substances, was reported as occurring in 3 patients who received from 100 to 600 mg. of chloroquine daily for a minimum of two and three-quarters years for the treatment of discoid lupus erythematosus or arthritis (Hobbs, H. E.; Sorsby, A., and Freedman, A.: Lancet 2:478, Oct. 3, 1959). Macular lesions and narrowed retinal vessels, and the scotomatous vision and field defects to which they gave rise, although evidently irreversible, ceased to progress on discontinuation of therapy. . . .
 
 
 81
 "If visual halos, focusing difficulties or blurred vision occur, the eyes should be examined periodically. Lowering dosage or discontinuing the drug is a matter for the physician to decide and depends on such factors as ophthalmological progression, and severity and clinical response of the disorder under treatment." (Defendants' Exhibit 15)
 
 
 82
 The same warning was given in defendants' new promotional booklet to be distributed to physicians, also issued in July, 1960, entitled "New chemotherapy of Rheumatoid Arthritis with Aralen." (Defendants' Exhibit 13)
 
 
 83
 The 1961 edition of the Physician's Desk Reference remained unchanged in regard to the side effects of Aralen (Plaintiff's Exhibit 61-22), and the product card and promotional booklet revised in 1960 remained in use throughout 1961.
 
 
 84
 In 1962, the Physician's Desk Reference only carried Aralen in its index, but contained no description of the drug. (Plaintiff's Exhibit 62-37A) In November of 1962, Winthrop revised its brochure, "New Chemotherapy of Rheumatoid Arthritis with Aralen Brand of Chloroquine," as follows:
 
 
 85
 "Ophthalmologic Reactions
 
 
 86
 "Visual changes of varying degrees of seriousness have been noted during treatment with anti-malarial compounds. . . .
 
 
 87
 "Retinal changes, consisting of narrowing of the retinal arterioles, macular lesions (areas of edema, atrophy and abnormal pigmentation), pallor of the optic disc, optic atrophy and patchy retinal pigmentation, have been reported as rarely occurring within several months to several years of chloroquine therapy; (Hobbs, Sorsby and Freedman; Rebello; Richards and Wilson). These complications are comparable to those observed with quinine, quinidine, salicylic acid and some other substances. Obtrusive symptoms of nyctalopia and scotomatous vision with field defects (such as paracentral, pericentral ring type, and typically temporal peripheral scotomas) resulted, for example, difficulty in reading with words tending to disappear, seeing only half an object, misty vision and fog before the eyes. Patients with visual difficulties may not be troubled by other side effects. Retinal changes were found to be practically irreversible and like the accompanying visual defect may progress on discontinuation of therapy; in 1 patient slight improvement in symptoms and field defects followed discontinuation of chloroquine and the institution of empirical therapy with a vasodilator (tolazoline hydrochloride) and oxygen (Hobbs, Eadie and Somerville). Although visual field defects almost always occurred in patients treated for two or more years and were accompanied by retinopathy, a few cases of scotomatous vision without retinal (funduscopic) changes have been observed after from several months to one year of therapy (Sataline and Farmer; Reed and Campbell; Spillane). These cases emphasize the necessity of periodic visual field examinations in order to detect early changes during prolonged treatment with the drug." (Plaintiff's Exhibit 62-34)
 
 
 88
 The product card for Aralen was revised in December of 1962 and contained substantially the same warning as that contained in the new brochure. (Plaintiff's Exhibit 62-35)
 
 
 89
 In 1963, defendants placed the following warning in that year's edition of the Physician's Desk Reference: "Retinal changes (narrowing of blood vessels, macular lesions, pallor of disc, pigmentation) with symptoms of nyctalopia and scotomatous vision have rarely occurred and were reported to be largely irreversible. In a few cases visual field defects appeared without retinal changes." (Defendants' Exhibit 7) In February, 1963, defendants mailed the following "Dear Doctor" letter, referred to in the text of the opinion, to 248,000 physicians (Plaintiff's Exhibit 63-43): "IMPORTANT DRUG PRECAUTIONS"
 
 
 90
 "Dear Doctor:
 
 
 91
 "The recent experience of various investigators has shown that Aralen(R) (brand of chloroquine), used alone or as an adjunct to other drugs and therapeutic measures, may be very helpful in the management of patients with lupus erythematosus or rheumatoid arthritis. Although many physicians have found that the incidence of serious side effects is lower than that encountered with other potent agents that are often employed in such patients, certain ocular complications have sometimes been reported during prolonged daily administration of chloroquine. Therefore, when chloroquine or any other antimalarial compound is to be given for long periods, it is essential that measures be taken to avoid or minimize these complications.
 
 
 92
 "Thus initial and periodic (trimonthly) ophthalmologic examinations (including expert slit-lamp, fundus and visual field studies) should be performed. The initial examination will reveal if any visual abnormalities, either coincidental or due to the disease, are present and will establish a base line for further assessment of the patient's vision. Should corneal changes occur (which are thought to be reversible and which sometimes even fade on continuance of treatment), the advantages of withdrawing the drug must be weighed in each case against the therapeutic benefits that may accrue from continuation of treatment (sometimes a severe relapse follows withdrawal). If visual disturbances occur-which are not fully explainable by difficulties of accommodation or corneal opacities-and particularly if there is any suggestion of visual field restriction or retinal change, administration of the drug should be stopped immediately and the patient closely observed for possible progression.
 
 
 93
 "We should like to request your cooperation in reporting to Winthrop Laboratories or to the Food and Drug Administration any patients in your own practice who have developed impairment of vision or retinal change during or subsequent to the administration of chloroquine.
 
 
 94
 "A reference card of a convenient size for filing is enclosed. It contains information on the various indications for Aralen (including lupus erythematosus, rheumatoid arthritis, malaria and amebiasis), dosage, side effects and precautions.
 
 
 95
 "Very truly yours, WINTHROP LABORATORIES E. J. Foley, M. D.
 
 
 96
 Vice President Medical Director"
 
 
 97
 HASTIE, Circuit Judge (concurring in part and dissenting in part).
 
 
 98
 I would affirm the judgment of the district court in its entirety.
 
 
 99
 In my view a jury question as to liability was presented and the verdict was warranted by the evidence pro and con that was introduced at trial on the vigorously contested contention that the harmful drug in question was marketed before the completion of adequate investigation, testing and experimentation to determine its side effects. Therefore, I find it unnecessary to resolve my serious concern about alleged errors in connection with other claimed bases of liability.
 
 
 100
 However, I dissent from the holding that the district court erred in its disposition of the matter of punitive damages. In my judgment, the trial judge properly viewed the evidence concerning the character and extent of the defendants' fault as inadequate to permit the submission of a claim for punitive damages to the jury, this procedure to be validated by a requested amendment of the complaint before the jury retired.
 
 
 
 [1]
 The plaintiff Hoffman is a citizen of Pennsylvania, and the defendants, Sterling Drug, Inc. and its division and wholly owned subsidiary Winthrop Laboratories, Inc., are Delaware corporations with their principal place of business in New York. Pennsylvania law applies
 
 
 [2]
 See Section 402A of the Restatement (Second) of Torts, which has been adopted as the law of Pennsylvania. Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (1966); Incollingo v. Ewing, 444 Pa. 263, 282 A.2d 206 (1971)
 
 
 [3]
 Count II alleged breach of express and implied warranties to the plaintiff and his doctors, but this issue was not submitted for the jury's consideration and no questions concerning it have been raised on appeal
 
 
 [4]
 Judge Herman's Memorandum and Order, filed January 5, 1972, is not reported for publication
 
 
 [5]
 Dr. Cohen was not able to appear at trial to testify because he had suffered a stroke, but his deposition was read to the jury
 
 
 [6]
 Transcript at 112-114
 
 
 [7]
 Id. at 76-83
 
 
 [8]
 Id. at 970, 977-978
 
 
 [9]
 Plaintiff's Exhibit 55-5
 
 
 [10]
 The Physician's Desk Reference is a publication containing information assembled from drug manufacturers which is sent to physicians to keep them abreast of the latest developments, uses, dosages, and effects of drugs
 
 
 [11]
 The record is ambiguous in regard to whether the supplemental new drug application was for rheumatoid arthritis and lupus erythematosus, or solely for rheumatoid arthritis
 
 
 [12]
 American Journal of Tropical Medicine and Hygiene, Vol. 6, pages 654-657 (1957); Plaintiff's Exhibit 57-1
 
 
 [13]
 Lancet, Vol. 1, pages 478-480 (1959); Plaintiff's Exhibit 59-1
 
 
 [14]
 Id. at 479
 
 
 [15]
 Id. at 480
 
 
 [16]
 Transcript at 1536
 
 
 [17]
 Plaintiff's Exhibits 62-34 and 62-35
 
 
 [18]
 Plaintiff's Exhibit 63-43
 
 
 [19]
 Prior to the 1962 amendments, 21 U.S. C. Sec. 321(p)(1) defined a "new drug" subject to the new drug procedures of Sec. 355 as "[a]ny drug the composition of which is such that such drug is not generally recognized, among experts . . . as safe for use under the conditions prescribed, recommended, or suggested in the labeling thereof, except that such a drug not so recognized shall not be deemed to be a 'new drug' if at any time prior to the enactment of this chapter it was subject to the Food and Drugs Act of June 30, 1906, as amended, and if at such time its labeling contained the same representations concerning the conditions of its use."
 The 1962 amendment of this section, Pub.L. 87-781, Title I, Sec. 102(a), 76 Stat. 781, is not relevant to the issues in the case at bar.
 
 
 [20]
 Defendants assert that prior to 1960 the filing of a supplemental new drug application was optional, citing the regulation then in effect, 21 C.F.R. Sec. 1.110(d) (1955), as follows: "After an application has become effective with respect to a drug the applicant may file a supplemental application with respect thereto setting forth any proposed change in the conditions under which such drug is to be used, in the labeling thereof, in any circumstance relating to its production, or in any other information contained in the effective application. Such supplemental application may omit statements made in the effective application concerning which no change is proposed." (Emphasis supplied by defendants.)
 The defendants' position is without merit. The regulation merely gives a drug company the option of filing a supplemental application for the above changes instead of a new drug application when a new drug application has already been approved, thereby eliminating the need to duplicate parts of the application previously approved.
 
 
 [21]
 Transcript at 1638
 
 
 [22]
 Defendants excepted only to the submission of the question of a statutory violation to the jury. The only "grounds of [their] objection" F.R.Civ.P. 51, were that there was no evidence of a statutory violation for the jury to consider. F.R. Civ.P. 51 requires that the "matter to which he [the party] objects and the grounds of his objection" be "distinctly" stated. The Supreme Court has said in this regard, ". . . In fairness to the trial court and to the parties, objections to a charge must be sufficiently specific to bring into focus the precise nature of the alleged error. Where a party might have obtained the correct charge by specifically calling the attention of the trial court to the error and where part of the charge was correct, he may not through a general exception obtain a new trial. . . ." Palmer v. Hoffman, 318 U.S. 109, 119, 63 S.Ct. 477, 483, 87 L.Ed. 645 (1942)
 Defendants' exception here fell short of the requirements of Rule 51.
 
 
 [23]
 We refer again to the testimony of Dr. Rice, discussed supra, and Defendants' Exhibit 134, supra. The issue was also narrowly drawn by the trial judge, who summarized plaintiff's position to the jury as follows: "He alleges . . . that contrary to law the defendant offered the drug to the public for use in the treatment of lupus erythematosus without first securing approval of the Federal Drug Administration." Transcript at 1898-99
 
 
 [24]
 Transcript at 1812
 
 
 [25]
 Defendants' witness, Dr. Rice, testified that there was no relationship between the letter and the note, that the note pertained to changes in defendants' product literature, and that the letter and the note were not attached in defendants' files. (Transcript at 1646-53). Dr. Rice's secretary, Miss Vreeland, corroborated this testimony and stated that she was the author of the note. (Transcript at 1053-56)
 
 
 [26]
 In particular, we believe the evidence that, when the defendants knew or should have known that prolonged use of Aralen could cause retinopathy, the defendants failed to use reasonable care to warn of the danger, is most persuasive. Breach of the duty to warn would result in liability under both the negligence and strict liability theories. See Basko v. Sterling Drug, Inc., 416 F.2d 417, 425-427 (2 Cir. 1969); Sterling Drug, Inc. v. Yarrow, 408 F.2d 978, 992 (8 Cir. 1969); and Restatement (Second) of Torts, Sec. 402A, Comments J, K (1965)
 
 
 [27]
 Although this objection was first raised in the trial court after the jury had retired (see F.R.Civ.P. 51 and Paluch v. Erie Lackawanna Railroad Co., 387 F.2d 996 (3 Cir. 1968)), we do not think that the exception was untimely under the circumstances here. At the conclusion of the main charge, defense counsel began to offer exceptions to the charge, but was directed by the judge to wait until after the judge had finished giving his supplemental charge containing corrections. After the supplemental charge, the jury was sent out at which time the judge allowed exceptions to the charge to be made for the record
 
 
 [28]
 We are concerned with long-term tests because the treatment of lupus erythematosus requires long-term use of Aralen
 
 
 [29]
 Transcript at 613, 622
 
 
 [30]
 Id. at 481
 
 
 [31]
 Id. at 623
 
 
 [32]
 Id. at 819
 
 
 [33]
 The district court charged the jury in respect to the adequacy of the warning given by defendants as follows:
 ". . . Now, I charge you that if you find that the defendant should have given a warning of the possible toxic effects of Aralen on the retina of the eyes of some person taking the drug over an extended period, then you should consider if the defendant gave a timely warning and one reasonably designed and adequate to inform such person taking the drug of the danger involved.
 "Since this was a prescription drug, notice directly to the user was virtually impossible and the notice to the prescribing physicians and treating physicians who knew plaintiff was taking the drug was the most practical.
 "Dr. Kammer . . . is the one that referred the plaintiff to Dr. Markey for his skin problem, and then this Dr. Kammer kept seeing the plaintiff for his other problems and knew in 1957 of the chloroquine treatment of Dr. Markey. That is why I said that any warning you find should be given, it seems to me, should be given not only to the prescribing physicians, Markey and Cohen, but also to the treating physician who knew that he was getting Aralen, because you will recall that Dr. Kammer said that 'if he had known of the danger of eye damage, he would certainly have told the plaintiff because he knew he was getting this medicine."'
 (Transcript at 1905-1907).
 
 
 [34]
 See, e. g., Davis v. Wyeth Laboratories, Inc., 399 F.2d 121 (9 Cir. 1968); Basko v. Sterling Drug, Inc., 416 F.2d 417 (2 Cir. 1969); Sterling Drug, Inc. v. Cornish, 370 F.2d 82 (8 Cir. 1967)
 
 
 [35]
 Transcript at 1105
 
 
 [36]
 Id. at 1125-26
 
 
 [37]
 There is no retirement age in plaintiff's profession
 
 
 [38]
 Transcript at 1322-26
 
 
 [39]
 Id. at 1325
 
 
 [40]
 Id. at 1346
 
 
 [41]
 The averments are as follows:
 "23. Defendants fraudulently, falsely and deceitfully misrepresented to the plaintiff and to his treating doctors material facts as to the safeness of defendants' product known as Aralen and that the defendant wilfully concealed from the plaintiff, his treating doctors and the Food and Drug Administration, their true state of knowledge about the drug, and that the defendants at the time of said misrepresentations and statements knew them to be untruthful.
 "24. If the defendants were not aware of the falsity of their statements, they knew at least they were ignorant of the truth of their statements by virtue of their failure to perform adequate and scientifically proper tests to determine the true nature of its product.
 "25. If the defendants were not aware of the falsity of their statements, they made such statements negligently, carelessly and recklessly without any factual basis and in disregard of reports to them of the harmful nature of their product."
 
 
 [42]
 Transcript at 1501-02
 
 
 [43]
 We note that prior to May 1, 1963, defendants were not obligated to notify the FDA of reports in scientific literature or unpublished reports from physicians involving the side effects of a drug for which a new drug application was in effect. The only obligation existing up to May 1, 1963, the effective date of the Drug Amendments of 1962, was to submit with the new drug application "full reports of investigations which have been made to show whether or not such drug is safe for use." 21 U.S.C. Sec. 355(b) (1958). In 1962, subsection (j) was added, 21 U.S.C. Sec. 355(j), which authorized the Secretary, by regulation or order, to require manufacturers of previously cleared new drugs to keep records and make reports to him of information obtained by them as to experience with respect to such drugs. Pub.L. 87-781, Title I, Sec. 103(a), Oct. 10, 1962, 76 Stat. 780, 782-83. See Legislative History, Drug Amendments of 1962, 2 U.S.Code Cong. and Adm.News, p. 2284 et seq. On June 20, 1963, a regulation was issued which for the first time required the reporting of clinical experience, studies, investigations, and tests reported to a drug manufacturer and reports in scientific literature obtained by it. 21 C.F.R. Sec. 130.13 (1964)
 Plaintiffs' charge that defendants failed to report such information to the FDA therefore cannot provide a basis for recovery. However, we think that the evidence that defendants marketed Aralen for use in the treatment of lupus erythematosus without prior FDA approval, discussed in Part I, supra, is relevant to and should be admissible on the question of recklessness on defendants' part.
 
 
 [44]
 Transcript at 300
 
 
 [45]
 Id. at 811
 
 
 [46]
 See Appendix A, part I
 
 
 [47]
 See Appendix A, part II
 
 
 [48]
 See Appendix B
 
 
 [49]
 Id. at 885-86
 
 
 [50]
 Id. at 933-34
 
 
 [51]
 Id. at 42, 49
 
 
 [52]
 See Appendix B
 
 
 [53]
 See Appendix B
 
 
 [54]
 See 28 U.S.C. Sec. 1920(2) and (3)