**James MAGILL, Administrator of the Estate of Frank W. Magill, Jr., Deceased,**

v.

**WESTINGHOUSE ELECTRIC CORPORATION, Appellant,**

v.

**MURPHY, INC.**

No. 71-1723.

United States Court of Appeals, Third Circuit.

Argued June 12, 1972.

Decided July 14, 1972.

F. Hastings Griffin, Jr., Deckert, Price & Rhoads, Philadelphia, Pa., for appellant.

Mark D. Alspach, Krusen, Evans & Byrne, and Charles F. Quinn, Sheer, Mazzocone & Quinn, Philadelphia, Pa., for appellees.

Before SEITZ, Chief Judge, and VAN DUSEN and ADAMS, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge:

This diversity action, under the wrongful death and survivorship statutes, presents several perplexing questions of

Pennsylvania law regarding liability and damages.

Frank Magill was employed as a journeyman painter by Murphy, Inc. (Murphy) in January, 1967, while Murphy, pursuant to contract, was engaged in painting the machines located at the Westinghouse Plant in Lester, Pennsylvania. Mr. Magill was killed on the night of January 27, 1967 when he was cleaning a lathe in preparation for painting it, and someone accidentally engaged the clutch causing the chuck of the lathe to rotate, crushing his skull.[1]

The administrator of Mr. Magill's estate commenced the present action against Westinghouse in June, 1967, and Westinghouse brought Murphy in as a third-party defendant on a theory of indemnity based on the contract between Murphy and Westinghouse.[2] After the trial, in response to five special interrogatories, the jury found that Westinghouse was negligent, that such negligence was a proximate cause of the accident, that Mr. Magill was not contributorily negligent, that the damages were $29,000 under the Wrongful Death Act and $171,270 under the Survival Act, and that Murphy was "not guilty of negligence contributing, in any degree, to the happening of the accident." Westinghouse's motions for judgments N.O.V. or in the alternative for new trials in both actions were denied by the district court, 327 F.Supp. 1097. Westinghouse appeals from the judgments entered against it in both the main case and its third-party action against Murphy for indemnity.

## I. SHOULD THE DISTRICT COURT HAVE GRANTED JUDGMENT N.O.V. IN MAGILL V. WESTINGHOUSE?

The central issue in the administrator's case against Westinghouse concerned the duty to make sure that the lathe had no power running to it while the Murphy employees were cleaning and painting it. Westinghouse contends that its duty as a possessor of land to a business invitee was satisfied because the uncontradicted testimony indicated that it was reasonable to believe that the dangerous condition would be obvious to, and discovered by an invitee. Mike v. Lebanon Miridites League, 421 Pa. 217, 218 A.2d 814 (1966). Westinghouse further urges that its duty to warn a business invitee of a known dangerous condition went no further than cautioning the contractor, and that it was not required to warn all of the contractor's employees individually.

Although in other factual contexts these legal arguments might be successful for Westinghouse, here they miss the mark. It was uncontradicted that the Murphy employees, including Mr. Magill, were unfamiliar with the power sources for any of the machinery contained in Building H. Moreover, the power switch on the lathe in question was a spring-loaded button, and a visual inspection of it would not warn anyone whether or not the power was activated in the lathe. Because a question of fact was presented in that the jury could have found that the danger of the lathe's being on was not obvious, and

---

1. Mr. Magill never regained consciousness prior to death.

2. The indemnity agreement reads in relevant part as follows:
   "The Contractor shall indemnify and save Westinghouse harmless * * * (2) from and against any and all claims, and suits, actions, liabilities, damages, or losses whatsoever (including expenses incidental thereto) for or on account of personal injury or death or property damages (other than such injury, death or damage as shall have been caused solely by the negligence of Westinghouse, its officers, agents, or employees) occurring in or in connection with the performance of this order or contract and sustained by any person whomsoever, including, without limitation, the Contractor, any employee or the Contractor, any employee of Westinghouse, or any other person."

that Westinghouse had therefore breached its duty as a possessor of land, the district court properly denied Westinghouse's motion for judgment N.O.V. in this regard. Additionally, the evidence was not at all clear that Westinghouse ever even warned the contractor that the machines should be turned off. In such circumstances the issues whether any warnings were given and to whom were for the jury and therefore judgment N.O.V. was not appropriate.

## II. DID CERTAIN TRIAL RULINGS REQUIRE THAT WESTINGHOUSE BE GRANTED A NEW TRIAL ON LIABILITY IN MAGILL V. WESTINGHOUSE?

A number of legal questions arose at trial, and Westinghouse urges that it be granted a new trial on the issue of liability based on alleged errors committed by the district court.

To establish a breach of a duty by Westinghouse, the administrator called two safety experts to testify as to what safe practices would be with regard to the fact situation presented in this case. Westinghouse vigorously asserts that the function of the jury was usurped when the trial judge permitted Mr. Landry, the second of the experts, to answer a question dealing with the usual and customary safeguards that *"should have* been applied in this type of situation * * *,"* because the expert gave an opinion on the ultimate question in the case.[3]

■ We note first that although Westinghouse objected to the question, it never set forth the ground now urged for reversal, Fed.R.Civ.P. 46, and we need not consider such an argument on appeal. In addition, in view of the overwhelming evidence that no warnings were given by Westinghouse and that no precautions were taken to insure that the lathe was turned off, it is apparent

that the ruling of the district court was not "inconsistent with substantial justice." Fed.R.Civ.P. 61. Furthermore, the jury was properly apprised of the use it could make of the expert testimony in determining the issue of liability

■ Westinghouse next asserts that it was reversible error for the district court to refuse to charge the jury that a possessor of land may insulate itself from liability by warning the contractor and need not warn the contractor's employees. To support its position, Westinghouse relies on Crane v. I.T.E. Circuit Breaker Co., 443 Pa. 442, 278 A.2d 362 (1971). There, Crane was the employee of an independent contractor who had been hired to remove certain pieces of heavy machinery from I.T.E.'s premises. Crane was injured when a large skid fell on him during the moving operation. The Supreme Court of Pennsylvania reversed a jury verdict for Crane and ordered the entry of judgment N.O. V. because the possessor of land—I.T.E. —did not retain control over the premises on which the contract work was being done and in such a case, the possessor need warn only the contractor, and not the contractor's employees. *Crane,* however, is distinguishable from this case, because here no evidence was introduced to indicate that Westinghouse did not have control over the premises. That Westinghouse did not in fact retain control may be inferred from the evidence that the Murphy employees did not know how to cut off the power to the machines and that on one occasion, when a Murphy employee did throw a power switch, a Westinghouse worker told him not to touch the power controls. Because there was evidence that control over the premises was exercised by Westinghouse, the district court did not err in refusing to give the point suggested by Westinghouse, and charging the jury as it did.

---

3. We are cognizant of the great concern that "trial by expert" may be adversely affecting our system of trial by jury.

*See, e. g.,* 2 Wigmore, Evidence 812 (3d ed. 1940).

## III. SHOULD THE DISTRICT COURT HAVE ENTERED JUDGMENT N.O.V. OR GRANTED A NEW TRIAL IN WESTINGHOUSE V. MURPHY?

In its third-party case against Murphy, Westinghouse relied primarily on the indemnity clause contained in its contract with Murphy, reproduced *supra* note 2. The crucial portion of the clause provides that Murphy will indemnify Westinghouse unless the loss was "caused solely by the negligence of Westinghouse * * *" Westinghouse urges that it is entitled to judgment N.O.V. against Murphy because the uncontradicted evidence demonstrated either that Murphy's negligence or its breach of contract was a cause of Mr. Magill's death.

It is clear from the evidence that whether Murphy was negligent at all in failing to insure that the lathe was not operative, and whether such negligence, if any, was a cause of the accident, constituted factual questions properly submitted to the jury.[4] Judgment N.O.V. would, therefore, have been improper in the claim of Westinghouse against Murphy.

Similarly, a careful review of the record shows that Westinghouse's assertion that it proved as a matter of law that Murphy breached its contract and that such breach was a cause of the accident cannot be upheld. At most, the contract between Westinghouse and Murphy contained a provision calling for Murphy to supervise the work of its painters on the job. Although Westinghouse attempted to prove through Mr. Murphy—president of Murphy, Inc.— that he had instructed his men to make sure the machines were off before they started to work in Building H, Westinghouse never attempted to prove that the term "supervision," as used in the contract, had a meaning different from its common usage. "[A]bsent parol evidence admitted to aid in construction and absent evidence of trade custom introduced to explain special terminology employed, it is the duty of the court to interpret a contract for the instant purpose." Trent v. Atlantic City Electric Co., 334 F.2d 847, 864 (1964). Based on the testimony that Murphy employees did not know how to turn off the power to the machines, and that they had been told by Westinghouse personnel not to touch the main power switches, the district court correctly determined that "supervision" in the contract should have its ordinary meaning, i. e., when a painting contractor agrees to supervise the work of his painters, the supervision extends only to the painting and not to dealing with the power source of the machines to be painted. Given this meaning of supervision, the district court could not have ruled as a matter of law that Murphy breached its contract with Westinghouse.

Westinghouse next contends that it is entitled to a new trial because interrogatory number 5 improperly put the question of the indemnity agreement to the jury. That interrogatory reads: "Was Murphy, Inc. guilty of negligence which contributed in any degree, to the happening of the accident in which Frank Magill was killed?" Under Pennsylvania law an indemnity agreement such as the one involved here means that indemnity is due whenever the contractor's negligence or breach of contract causes the accident. *See* Perry v. Payne, 217 Pa. 252, 66 A. 553 (1907). As we noted above, under the proper interpretation of the contract, Murphy did not breach its duty to supervise its painters. Therefore, the only question remaining for the jury was the possibility of Murphy's negligence as a cause of the accident. This issue was properly submitted to the jury, and there is no basis for a new trial in this regard.

We have considered the other contentions of Westinghouse concerning its

---

4. In answer to interrogatory number 5, the jury found that any possible negligence by Murphy did not, in any degree, contribute to the happening of the accident.

third-party action and find them to be without merit.

## IV. IS A NEW TRIAL LIMITED TO THE ISSUE OF DAMAGES, REQUIRED IN MAGILL V. WESTINGHOUSE?

In order to prove the wages lost by Mr. Magill as a result of his accidental death, the administrator called two witnesses: (1) a Murphy payroll clerk to state the wages Mr. Magill received as a journeyman painter up to the time of his death and the hourly rate received by Murphy's journeyman painters from the time of his death to the date of trial; and (2) Mr. Goodfarb, an actuary, to testify regarding Mr. Magill's life and work expectancies, the reduction of future wages to present worth at a rate of 6%, and the effect of an earnings increase factor of 3½%.

The payroll clerk testified that for the year prior to his death and the month of January 1967, Mr. Magill was compensated at a rate of $4.37 per hour, that the hourly rate increased in 1968 to $4.66½, in 1969 to 4.91½, and in 1970 to $5.21½. The total increase in the four year period was approximately 19%, or an average of 4¾% per year.

The actuary then, based on the 6% reduction figure required by Pennsylvania law,[5] testified how much money must be invested to return one dollar per year for various periods of time. He next, over strenuous objection, told the jury what the effect on these present worth figures would be if the jury calculated an earnings increase factor of 3½%.[6] Assuming a work expectancy period of 25 years, the jury was informed that use of such a figure would increase their award by one third. The district court overruled the Westinghouse objection and charged the jury:

"That is one set of numbers [present worth]. There is another set of numbers which you will also have to consider, but you are going to have to make the determination whether you want to apply it. There is a set of numbers that take into account what the actuary called an earnings increase factor. He set that at 3½ percent. By doing so he is estimating that in the future earnings will continue to rise, prices will continue to rise, and he says at the rate of 3½ percent a year. That is a factor which he concedes is simply a guess but yet is used in certain circumstances, and, as I recall, he indicated that it is used for purposes of determining the soundness of certain pension funds, that this 3½ percent is not used universally, but he did indicate that the range is between three and four percent.

"You may or may not wish to accept that earnings increase factor as a proper element in this case. That is for you to determine, members of the jury. You will have to consider whether the earnings increase factor should be awarded. You would thereby be saying, if you did award it, that you believe that earnings will continue to go on for the next 20 or 30 years in a constantly ascending scale. If you do come to that conclusion, then you have the figures here for 20 years, 25 years, and 30 years, and again you would go through simply the same process. Instead of applying, for example, $15.37 as the factor, you would instead apply the factor of $20.16."

5. Brodie v. Phila. Transp. Co., 415 Pa. 296, 298, 203 A.2d 657, 659 (1964).

6. The importance of an earnings increase factor in actuarial calculations was pointed out during Mr. Goodfarb's testimony. He explained it as:
   "a factor used by actuaries in their evaluation of pension programs where the pension to be paid the employee is based on his earnings for the last five or ten years of enjoyment. Since that period may be many years hence, we have the problem of estimating future earnings in order to arrive at the cost of pensions, and we therefore have an earnings increase factor as part of our work."

Westinghouse asserts that the testimony coupled with a charge allowing the jury to make use of the earnings increase factor controverts Pennsylvania's mandatory 6% reduction to present worth rule, and permits the jury to speculate unnecessarily concerning an inflationary spiral which may or may not continue.

It is unquestionable that Pennsylvania law requires the reduction of future earnings to present worth at a rate of 6%. No Pennsylvania case, however, has been brought to our attention which would forbid the jury from considering future earning power in determining total future earnings prior to reducing them to present worth. To the contrary, Pennsylvania decisional law appears to make future *earning power* a proper subject for jury consideration when the administrator of the estate has introduced sufficient evidence to lay an adequate foundation for such deliberation.

" * * * When the probable earnings of the deceased are to be taken into account in fixing the damages it is the duty of the plaintiff to show the earning power of the deceased, or give such evidence in regard to his business, business habits, and past earnings, as may afford some basis from which earning capacity may be fairly estimated. Pennsylvania Railroad Co. v. Zebe, 33 Pa. 318; Pennsylvania Railroad Co. v. Vandever, 36 Pa. 298. The true measure of damages is the pecuniary loss suffered, without any solatium for mental suffering or grief; and the pecuniary loss is what the deceased would probably have earned by his labor, physical or intellectual, in his business or profession, if the injury that caused death had not befallen him, and which would have gone to the support of his family. In fixing this amount, consideration should be given to the age of the deceased, his health, his ability and

disposition to labor, his habits of living, and his expenditures."
Pilipovich v. Pittsburgh Coal Co., 314 Pa. 585, 172 A. 136 (1934), *citing* McHugh v. Schlosser, 159 Pa. 480, 28 A. 291 (1844); *see* Smail v. Flock, 407 Pa. 148, 180 A.2d 59 (1962).

It seems, therefore, that had the administrator introduced well-founded evidence that Mr. Magill would have received certain promotions or pay raises in the future, such evidence might not have been objectionable. However, the Pennsylvania Supreme Court "has held repeatedly that a claim for damages must be supported by a reasonable basis for calculation; mere guess or speculation is not enough." Stevenson v. Economy Bank of Ambridge, 413 Pa. 442, 197 A.2d 721, 727 (1964).

Here, Mr. Goodfarb was qualified as an expert on actuarial calculations but not as an economist. He stated as the basis for his use of an earnings increase factor that every accounting firm he knew used a figure of 3% or 4% when calculating the sum of money necessary to fund a pension plan, and that his firm "split the difference" by choosing 3½%. Beyond this, no evidence was offered to show that 3½% was determined by other than "mere guess or speculation."

This Court has recently recognized that juries should be given valid data, when available, for computing damages in order to prevent the jury from speculating.[7] However, we must also realize that trading one speculative figure, the earnings increase factor, for another, the jury's best guess as to what Mr. Magill would have earned in the future, would undoubtedly confuse an already difficult situation. While the district court, in its charge did all that was possible to place the relevant factors for determining damages before the jury, the lack of foundation for the earnings increase factor was a fatal defect requiring a new trial in Magill v. West-

7. *See* Ballantine v. Central R.R. of N.J., 460 F.2d 540 (3d Cir. 1972); Haddigan v. Harkins, 441 F.2d 844 (3d Cir. 1970).

inghouse, limited to the issue of damages.

Because there may be a substantial factual basis for use of an earnings increase factor, we do not foreclose the administrator from attempting, at the new trial, to establish that foundation and receiving a charge similar to that given at the original trial. We note, however, that the concepts of inflation and the declining value of the dollar have been almost universally rejected as providing support for the earnings increase factor. See Sleeman v. C & O R. Co., 414 F.2d 305, 308 (6th Cir. 1969); McWeeney v. N. Y. N. H. & H. R. R. Co., 282 F.2d 34, 38 (2d Cir. 1960).

One other point requires discussion. The jury returned verdicts of $29,000 under the Wrongful Death Act and $171,270 under the Survival Act. Westinghouse urges that the Survival verdict ignored the evidence and the charge, and was excessive. The district court recognized that a mistake might have been made, but because the *total* verdicts were not excessive, declined to disturb the jury's findings.

Even taking the evidence in the light most favorable to the plaintiff, testimony indicated that Mr. Magill contributed all but $1,000 per year to his family—the only factor to be considered in the Survival Action since there was no pain and suffering. Assuming the work expectancy of 25 years established by plaintiff, that Mr. Magill would not have spent any of the $1,000 on himself, and even including the earnings increase factor, the maximum recovery under the Survival Act would appear to be less than $20,000, a significant departure from the $171,270 actually awarded. In these circumstances, "when the verdict manifests that the jury has not followed the court's instructions, a party adversely affected by the jury's breach of duty may move for a new trial; and on the motion the trial court is under a positive duty to grant appropriate relief to such a party and its refusal to do so is reviewable." 6A Moore, Federal Practice

¶5908 [4] at 3803 (2d Ed. 1966). Thus, even had we approved the earnings, increase factor as presented, we would have been required to grant a new trial on damages in any event.

Accordingly, the judgments on liability in both cases will be affirmed, and the cause remanded for a new trial limited to the issue of damages in Magill v. Westinghouse.