Robert T. **WEAVER**, Administrator of the Estate of Elizabeth Ann Weaver, Deceased, et al.

v.

**FORD MOTOR COMPANY.**

Civ. A. No. 43259.

United States District Court, E. D. Pennsylvania.

Sept. 12, 1974.

---

James E. Beasley, Philadelphia, Pa., for plaintiffs.

White & Williams, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

BRODERICK, District Judge.

In this products liability suit, following a jury verdict in favor of all plaintiffs and against defendant Ford Motor Company, Ford has moved for a new

trial. After carefully considering all the grounds urged by defendant the Court has determined that it must deny the motion for a new trial.

The death and injuries complained of in this lawsuit occurred as a result of a single vehicle accident which took place near Nairobi, Kenya, on September 9, 1966. Reverend Edward E. Weaver, a missionary on assignment to Kenya, was driving a 1963 eight-passenger Ford Econoline Van, in which his five children and two native missionary trainees were riding, when the vehicle left a four-lane highway and tumbled down a steep embankment. Elizabeth Ann Weaver, the five-year old daughter of Reverend Weaver, was killed, and Reverend Weaver and the two native missionary trainees were injured.

Plaintiffs in the case are Robert T. Weaver, the Administrator of the Estate of Elizabeth Ann Weaver, suing under the Pennsylvania Survival Act; Reverend and Mrs. Weaver, suing pursuant to the Pennsylvania Wrongful Death Act; and Reverend Weaver, Richard Muumbi, and Stanley Njoroge suing on their own behalf.

The plaintiffs alleged at trial that the accident occurred because the Ford van was defectively designed and/or manufactured, making it unreasonably dangerous to its intended users. Specifically, plaintiffs charged that, at the time of the accident, as a result of fatigue cracks in the frame, the van's weight was thrown onto the left front part of the vehicle causing a stress which was too great for the left front spring. Plaintiffs claimed that as a consequence one leaf of this spring snapped which added additional stress onto the stabilizer bar and stabilizer link. According to plaintiffs, a defective weld between the stabilizer bar and link failed to hold causing the stabilizer bar on the left side of the vehicle to fall and jam into the left front wheel preventing the turning of the steering wheel, and as a result the van went off the road and down the embankment. Plaintiffs asserted that if the U-Frames which were attached to

the floor of the van had been properly designed and manufactured or if the stabilizer bar or link had been properly designed and manufactured, the steering wheel would not have locked and the accident would not have occurred.

The issues of liability and damages were severed and the jury rendered a liability verdict in favor of all the plaintiffs and against the defendant. The jury then awarded damages in the amounts of $82,500 to the Administrator of the Estate of Elizabeth Ann Weaver, $5,000 to her parents under the Wrongful Death Act, $9000 to Edward E. Weaver for his own injuries, $4,250 to Richard Muumbi and $2500 to Stanley Njorode.

### Motion for New Trial

The defendant Ford Motor Company asserts four grounds in support of its motion for a new trial. First, the defendant contends that the Court erred in excluding evidence of an experiment which defendant offered in order to disprove plaintiffs' allegations as to the cause of the accident. Second, the defendant claims error in the admission of certain actuarial testimony by one of the plaintiffs' expert witnesses. Third, the defendant urges a new trial on the ground that the verdicts in the survival and wrongful death actions were excessive. Finally, the defendant contends that the Court erred in failing to charge the jury, on the question of damages, as to the possibility that the deceased Elizabeth Weaver would have married and never earned any income so as to preclude an award under the Survival Act.

### Evidence of Defendant's Experiment

Defendant's first contention is that the Court erred in excluding evidence of an experiment, conducted by one of defendant's employees, which was offered to disprove plaintiffs' allegations as to the cause of the accident. Defendant further contends that the Court's statements made to the jury in excluding this same evidence were erroneous and prejudicial.

Defendant's employee and expert witness, Thomas M. Stockman, offered to testify that on the Friday before the Monday commencement of trial he had conducted an experiment on a 1963 Ford Econoline Van, the results of which tended to disprove the assertion of plaintiffs' experts that the failure of a weld connecting the stabilizer bar to the axle through the stabilizer link would result in a locking of the front wheels of the vehicle. Plaintiffs objected to evidence of the experiment on the basis that it had not been listed in the Pretrial Order. Initially, the Court overruled plaintiffs' objection, and the Court and jury heard the defendant's expert testify concerning the experiment which he had conducted.

Mr. Stockman testified that his experiment showed that when the stabilizer bar was disconnected from the stabilizer link and, therefore, the axle, it remained in the same relative position with respect to the wheel. According to him, in either a rebound or full bump position the left front wheel would have to be displaced three and a half inches to the rear and two inches to the right before there could be any contact between the stabilizer bar and the wheel (N.T. 4–211, 212). Mr. Stockman had taken a number of photographs during the experiment which he offered to support his contentions. At this point the plaintiffs' attorney was permitted to cross-examine concerning the conditions under which the experiment was conducted. Upon cross-examination it became apparent that Mr. Stockman had conducted his experiment upon a 1963 Ford Econoline Van of a later model than the van involved in the accident. The later model had been redesigned to carry 2,000 pounds instead of the 1,400 pounds load weight assigned to the plaintiffs' model. Moreover, the experiment was conducted by hoisting the van and then maneuvering the wheels with hydraulic lifts. Thus, the experiment did not approximate the dynamic forces of plaintiffs' vehicle moving at 45 mph as was the situation at the time of the accident. Nor

did the experiment take into account the conditions created by the fractured frame of plaintiffs' van. Cross-examination also revealed that the stabilizer bar on the van used in the experiment differed from the stabilizer bar on plaintiffs' vehicle in that it had a kink in it for the purpose of clearing the larger brake assembly of the Econoline Van used in the experiment.

In view of the aforesaid differences between the experiment and the accident, the Court determined that the experiment was not "substantially similar" to the facts of the accident. Because of the confusing effect that such a dissimilar experiment might have had upon the jury, the Court granted plaintiffs' motion to strike all the testimony regarding the experiment. It is defendant's position that the Court erred in finding that the experiment was not substantially similar to the accident.

Experimental evidence is admissible only upon a foundational showing of "substantial similarity" between the tests conducted and of actual conditions. Glick v. White Motor Company, 458 F.2d 1287 (3d Cir. 1972); Ramseyer v. General Motors Corp., 417 F.2d 859 (8th Cir. 1969). "Substantial similarity" is a relative term, and in its measurement the trial court must exercise discretion. Lever Bros. Co. v. Atlas Assur. Co., 131 F.2d 770 (7th Cir. 1942). Indeed, the admission of testimony based on experiments is ultimately a matter resting largely within the discretion of the trial court. Hopkins v. E. I. Du Pont De Nemours & Co., 199 F.2d 930 (3rd Cir. 1952). The key to the Court's exercise of discretion "is that evidence of the sort, when relevant, should be admitted, unless in the discretion of the trial Court it seems to involve a serious inconvenience by way of unfair surprise or confusion of issues." Hopkins v. E. I. Du Pont De Nemours, *supra*, p. 934, n. 5; II Wigmore, Evidence § 444 (3d ed. 1940). The Court determined that precisely such serious inconvenience by way of unfair surprise and confusion of issues would have oc-

curred had the experimental testimony in this case been admitted. Therefore, the Court properly exercised its discretion by excluding the evidence.

The Court was deeply concerned over the unfair surprise caused to plaintiffs by the introduction of this evidence. The Pretrial Order in this case included no reference to any experiment or to any photos made by the defendant to be used as evidence in the case.[1] The defendant's experiment was conducted on the Friday before the Monday opening of trial, and the results of the experiment and the photos of it were made available to the plaintiffs either the day trial commenced or one day into the trial itself. To have permitted the defendant, that late in the proceedings, to have asserted a defense not disclosed in the Pretrial Order would have seriously jeopardized plaintiffs' opportunity for effective cross-examination. The defense, on the other hand, had had five years to prepare its case (suit having commenced on August 2, 1967). Exclusion of the evidence on the grounds, at least in part, of failure to comply with the Pretrial Order cannot be said to have resulted in "manifest injustice."[2] On the contrary, to have admitted the evidence would have been manifestly unfair to the plaintiffs. *See* Wiggins v. City of Philadelphia, 331 F.2d 521 (3d Cir. 1964); Kline v. Flickinger Co., 314 F.2d 464 (3d Cir. 1963).

Furthermore, the Court was satisfied that the evidence failed to demonstrate that the conditions of the experiment were the same or substantially similar to those which existed at the time of the accident. Moreover, the Court was convinced that such testimony would have been confusing to the jury even if accompanied by limiting instructions. Convinced that the excluded evidence would have produced a confusion of is-sues as well as unfair surprise, the Court properly exercised its discretion in excluding the evidence of the experiment.

■ The defendant contends moreover that the Court erred not only in excluding the evidence of the experiment but also erred in its curative instruction to the jury. In excluding Mr. Stockman's testimony, the Court explained to the jury that one of the bases for the exclusion was that the Court had determined that the conditions of the experiment were not substantially similar to those surrounding the accident (N.T. 5–13, 14). Mr. Stockman had testified that the experiment *had* yielded precisely the same results as would a test under circumstances nearer to those of the accident (N.T. 4–221, 222, 226). The defendant objected to the Court's curative instruction on the ground that it was not justified and was a direct contradic-tion of the testimony of Mr. Stockman and, hence, highly prejudicial. The Court finds it difficult to accept this objection. The jury was entitled to know the reasons for the Court's instruction to disregard evidence. Giving the defendant's objection the broadest possible interpretation, the Court can only surmise that the basis for defendant's allegation of prejudice is that it resulted in impeaching that portion of Mr. Stockman's testimony which was not excluded. Mr. Stockman's credibility was not prejudiced by the Court's explanation to the jury. The Court's curative instructon to the jury was not prejudicial to the defendant and cannot be the basis for ordering a new trial.

### Plaintiffs' Actuarial Testimony

■ Defendant also claims error in the admission of testimony by plaintiffs' expert witness, an actuary. He testified as to the different average lifetime

---

1. The standing order of this court in connection with the pre-trial order provided, *inter alia*:

 Exhibits not listed may not be introduced at trial except where exclusion would produce injustice.

2. *See* Fed.R.Civ.P. 16.

earnings of a female with an elementary school education, a high school education, a technical school education and a college education (N.T. 7–43–53). The actuary, Mr. Goodfarb, testified that the source of his figures was Technical Paper No. 16 of the United States Department of Health, Education and Welfare, published in 1967 (N.T. 7–47). Using this source, the witness gave the average total earnings, for each of the above classes, over a period of work expectancy to age sixty-five, and then reduced each figure to present worth. Included in each figure was an earnings increase factor of 3% (N.T. 7–48). Mr. Goodfarb subsequently reduced each figure by an average cost of maintenance also supplied by the technical paper. Finally, the witness adjusted each figure to account for a woman marrying and withdrawing from the labor market for an average period of twelve years (N.T. 7–53).

At trial, the defendant objected to such testimony as being "hearsay" and "speculative." The defendant did not, however, specifically object to a use of the 3% earnings increase factor. The gist of defendant's objection, as now delineated in the brief in support of his motion appears to be fourfold: first, that the tables as sources of testimony were hearsay; second, that the figures derived therefrom were too speculative in that they were merely averages; third, that the testimony of average earning power was additionally speculative in a case in which no earning capacity had been established; and fourth, that the figures improperly included an earnings increase factor.

As for the argument that the use of HEW statistics constituted hearsay and was, therefore, inadmissible, the Court cannot agree. The statistical tabulation used by the actuary in this case to arrive at an average income for particular categories of young single females, although hearsay, was admissible as an exception to the hearsay rule. The question comes down to whether an expert may refer to an official paper prepared by an agency of the United States Government, which paper is generally accepted as a basis for opinion in his profession. The Third Circuit has answered this question in the affirmative in Bair v. American Motors Corp., 473 F.2d 740 (3d Cir. 1973). Referring to a vintage Second Circuit decision which allowed an expert to read from statistical reports prepared by the United States Department of Agriculture, the Third Circuit has stated:

> That courts must, on hearsay grounds, be deprived of the use of the collected data on which other departments of government, industry, and the engineering profession obviously rely, makes no more sense now than in 1897, when that notion was rejected by the Second Circuit. *Id.* at 744.

Thus Mr. Goodfarb's testimony based on the government tables was properly admitted into evidence.

■ Defendant also claims that the figures derived from the government paper were too speculative in that they were merely averages. It is the Court's opinion that the use of averages (here the average income of females with different levels of education) founded on certain and constant data and savoring of the exact sciences, is a relevant factor, with a sufficient factual basis, for use in determining damages by the jury. See VI Wigmore, Evidence § 1698. Courts have long accepted the use of mortality and annuity tables, especially those compiled by a United States Government Agency. Such tables, although reflecting mere probabilities and working averages, are compiled with great "thoroughness, sifted, arranged and stated by trained observers." *Id.* Here there is not a trade-off of one speculative figure for another. The figures used by the actuary were based on statistics compiled by the Department of Health, Education and Welfare, measured through certain and constant data by reliable scientific methods and based on the average experiences of American females. As such the working averages presented by the actuary are entitled to

the same judicial acceptance as are comparably compiled mortality and annuity tables.

Next, the defendant contends that the use of statistics of average earning power was too speculative in a case such as this where, according to the defendant, no earning capacity of the decedent had been established. Preliminarily the Court cannot agree that no earning capacity of the decedent was established at trial. There was ample evidence adduced of Elizabeth's intelligence, health and of the likelihood of her receiving a college education. Certainly these factors indicate earning capacity. Magill v. Westinghouse, 464 F.2d 294 (3d Cir. 1972), citing Pilipovich v. Pittsburgh Coal Co., 314 Pa. 585, 172 A. 136 (1934). In any event, in a suit for the death of a minor there is no need to establish with precision the future earning power of the deceased before compensation for loss of potential earnings may be awarded. See Incollingo v. Ewing, 444 Pa. 263, 282 A.2d 206 (1971); Blisard v. Vargo, 185 F.Supp. 73 (E.D. Pa.1960). The estate of the deceased has a right to recover for loss of potential earnings and, as discussed above, a jury may consider averages reliably determined as competent evidence of lost earning potential.

Finally, defendant contends that it was error to permit the actuary to include an earnings increase factor of 3%. Defendant relies upon Magill v. Westinghouse, *supra*, a decision handed down by our Circuit Court shortly after this case was tried. In *Magill*, the actuary testified as to the amount to be invested to return one dollar per year for various periods of time based on the 6% reduction figure required by Pennsylvania law. He then, over strenuous objection, told the jury what the effect on the present worth figures would be if the jury calculated an earnings increase factor of 3½%. Our Circuit Court held that the testimony concerning the 3½% earnings increase factor was speculative and that its admission by the trial court was error in that the record contained

no evidence which would provide a substantial factual basis for using the earnings increase factor. The Court pointed out that the actuary was not qualified to testify as to future economic trends. The Circuit Court recently reaffirmed its position on the use of an earnings increase factor in Hoffman v. Sterling Drug, Inc., 485 F.2d 132 (3d Cir. 1973). There is no doubt, therefore, that testimony concerning an increase factor is objectionable, unless evidence is presented which would provide a substantial factual basis for the use of such a factor.

At the trial of this case, however, the defendant did not object to the testimony by the actuary concerning the use of the 3% earnings increase factor. It was not until the defendant filed its motion for a new trial that this objection was specifically raised.

Specific objection to a ruling of the trial judge is a condition precedent to a motion for a new trial based upon error in connection with such ruling. A party may not object at trial to the admission of evidence on one theory and later complain about the admission of such evidence on another ground. See Roberts v. United States, 316 F.2d 489, 497 (3d Cir. 1963). Rule 46 of the Federal Rules of Civil Procedure requires that a party make known to the Court at the time the Court makes its ruling the specific grounds for the objection. Reck v. Pacific-Atlantic S. S. Co., 180 F.2d 866 (2d Cir. 1950). As stated in 5A Moore's Federal Practice, ¶ 46.02, at 1903:

> It is still necessary for the party to make it clear to the court that he objects to the court's action, and state the grounds upon which he bases his objection, in order that the defect may be obviated if possible . . . .

Our federal courts have been rather consistent in holding that the reviewing court should review error not properly objected to at the trial only in those exceptional cases where the court determines that in the interest of justice

the error should be reviewed. Colonial Refrigerated Transportation, Inc. v. Mitchell, 403 F.2d 541 (5th Cir. 1968); Curko v. William Spencer & Son Corp., 294 F.2d 410 (2d Cir. 1961); Madison v. Phillips, 103 U.S.App.D.C. 11, 254 F.2d 348 (1958).

We are not able to ascertain whether the jury applied the earnings increase factor in arriving at its verdict of $82,500. The actuary testified that the present value of the decedent's life earnings with a 3% earnings increase factor included, less the 12-year average absence of a female from the work force, and less the cost of maintenance with a 3% increase factor included, amounted to (a) $157,201 for a female with an elementary education, (b) $243,281 for a female with a high school education; (c) $394,188 for a female with technical school education, and (d) $487,707 for a female with a college education. The verdict was $82,500, and it included damages for the decedent's pain and suffering. Hence, the 3% earnings increase factor was, at the most, an insignificant part of the total damages awarded.

Furthermore, as mandated by Rule 61 of the Federal Rules of Civil Procedure, "no error in either the admission or the exclusion of evidence . . . is ground for granting a new trial . . . unless refusal to take such action appears to the Court inconsistent with substantial justice." The verdict in this case does not appear to this court "inconsistent with substantial justice."

### Excessiveness of the Verdicts

 Defendant also urges a new trial on the ground that the verdicts of $82,500 in the survival action and of $5,000 in the wrongful death action were excessive. In assessing this contention the Court must bear in mind that in Pennsylvania and in this Circuit the jury's award may be found to be excessive only if "it shocks the conscience of the court." Gullborg v. Rizzo, 331 F.2d

557, 561 (3d Cir. 1964); Perry v. Pittsburgh Rys. Co., 357 Pa. 608, 55 A.2d 354 (1947).

In its supporting brief, defendant argues that the combined verdict of $87,500 in the survival and wrongful death actions is "higher than any sustained verdict anywhere for the death of a child of comparable age," and that, therefore, the verdicts must be excessive. In reply, plaintiffs point to a recent Pennsylvania case where the death of a six-year old girl was in issue, in which a jury award of $215,000 under the Survival and Wrongful Death Acts was sustained.[3] Such a comparative approach is of only limited usefulness. Each case must be evaluated on its merits within the framework of its distinctive facts. Scoville v. Missouri Pacific Railroad Company, 458 F.2d 639 (8th Cir. 1972).

 Under the Pennsylvania Survival Act then in effect, 20 P.S. § 320.601 et seq., the Estate of Elizabeth Ann Weaver is entitled to the present value of the decedent's prospective earnings for the period of her work-life expectancy after reaching the age of twenty-one, less her anticipated maintenance expenses, plus recovery for her pain and suffering. Gullborg v. Rizzo, *supra*. With regard to the decedent's probable future earnings, there was evidence adduced at trial of Elizabeth's intelligence (N.T. 6–73, 74), of her father's desire to have her attend college in the United States (as his oldest son was doing at the time of trial) (N.T. 6–39–41), and the necessity of her remaining in the United States after graduation, since Kenyan regulations would not permit her to work there (N.T. 7–32–34). There was actuarial testimony that the net future earnings, reduced to present worth, of the average woman with a college degree, even if she married and withdrew from the labor market for an average period of time (12 years) to raise her children, would be $487,707. The expected net earnings, reduced to

3. Incollingo v. Ewing, *supra*.

present worth, of a woman with only an elementary school education would be $157,201. It is clear, therefore, that there was evidence upon which the jury could have based its award of $82,500 in the survival action—even if the award had been only for loss of expected net earnings. In addition, under the Survival Act the jury is permitted to include damages for pain and suffering. There was testimony that the child was alive and conscious after she had been fatally injured and that she was frightened. A substantial portion of the $82,500 verdict could easily have represented the jury's award for pain and suffering.

It is clear from the foregoing discussion that there was evidence upon which the jury could have rationally predicated its verdict of $82,500 in the survival action. Although the jury's verdict is high, it does not shock the conscience of the Court.

■ Under the Pennsylvania Wrongful Death Act, 12 P.S. § 1601 et seq., the parents of Elizabeth Ann Weaver are entitled to recover the cost of her medical care and funeral expenses and the expenses of administration immediately attendant upon her death. The parents are also entitled to recover for the financial assistance and the pecuniary value of the services which Elizabeth would have rendered to her family until her twenty-first birthday or her marriage, whichever would occur first —less the probable cost of Elizabeth's maintenance during that period. There was extensive evidence adduced at trial as to the considerable assistance that the Weaver children, including Elizabeth, rendered to the family in missionary work, as well as in the tasks required by their rural life in Nairobi (N.T. 6–41, 42; 7–8, 9, 20). There was also testimony as to the nominal expense of maintaining the Weaver children (approximately $500 a year for the young girls and about $1,000 annually for a sixteen-year-old son) (N.T. 7–7). With regard to the expense of the college education that the Weavers desired their children to have, Reverend Weaver testified that his oldest son, as the child of a missionary, had a scholarship which provided part of these costs (N.T. 7–6). The jury could, therefore, consider that Elizabeth might someday have a similar scholarship, thus lessening the financial burden to her parents and thereby increase her net contribution. Certainly such a verdict does not shock the conscience of the Court.

### Charge on Damages

■ Finally, defendant contends that the Court's charge to the jury, on the question of damages in the survival action, was erroneous in that the Court failed to charge the jury that if they found that Elizabeth Weaver would not have worked after her twenty-first birthday then the decedent's future earnings would have been less than her cost of maintenance, and, therefore, there could be no award for prospective earnings under the Survival Act. It is defendant's position (a position which was argued to the jury during defense counsel's closing statement) that the decedent female probably would have married, raised a family, and never earned any income, a possibility of which a jury is well aware. Women are no longer likely to refrain permanently from entering the job market, even if they are married and have children. As evidence introduced in this case points out, the typical married woman in America is likely to withdraw from the job market for a period of only twelve years. In any event, the Court's charge properly left it to the jury to determine the future earnings of Elizabeth Weaver.

### Conclusion

For all the above reasons, the Court concludes that defendant's contentions in support of its motion lack sufficient merit for the Court to order a new trial.